UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
UNITED STATES OF AMERICA &
STATE OF NEW YORK,
*ex rel.* MILON NUS,
*Plaintiffs and Relator*

v.

HOME FAMILY CARE, INC.,
ALEXANDER KISELEV &
MICHAIL GUREVICH a/k/a MICHAIL GUREVICH
a/k/a MIKHAIL GUREVICH
*Defendants.*
----------------------------------------------------------x

**ECF Case**
Case No. 10-CV-2490
(Johnson, J.)
(Orenstein, M.J.)

**COMPLAINT IN
INTERVENTION OF THE
UNITED STATES &
THE STATE OF NEW YORK**

JURY TRIAL DEMANDED

For their Complaint in Intervention against Defendants Home Family Care Inc. ("HFC"), Alexander Kiselev and Michael Gurevich, the United States of America, by its attorney Robert L. Capers, United States Attorney for the Eastern District of New York, Elliot M. Schachner, Assistant U.S. Attorney, of counsel, and the State of New York, by its attorney Eric T. Schneiderman, Attorney General for the State of New York, allege as follows upon information and belief:

## I.    NATURE OF THE ACTION

1.    The State of New York (the "State") brings this action to recover treble damages and civil penalties under the New York False Claims Act,  N.Y. State Finance Law §§ 187-190 ("NY FCA") against Defendants HFC, Alexander Kiselev and Michael Gurevich, and to recover damages and other monetary relief under N.Y. Social Services Law § 145-b, N.Y. Executive Law § 63(12), N.Y. Executive Law § 63-c, and unjust enrichment.

2.     The United States of America (the "United States") brings this action to recover treble damages and penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733.

3.     The State and the United States seek to recover from Defendants millions of dollars in damages incurred by the New York State Medical Assistance Program ("Medicaid Program" or "Medicaid") and the United States Department of Health and Human Services ("HHS"), Centers for Medicare & Medicaid Services, formerly known as the Health Care Financing Administration ("CMS"), as a result of thousands of false and fraudulent claims that HFC, a licensed homecare services agency, Alexander Kiselev, the co-owner and President of HFC, and Michael Gurevich, the former Vice President of HFC, knowingly or recklessly presented or caused to be presented to the State and the United States for purported home health aide and personal care aide services.

4.     HFC holds itself out as being in the business of providing home health aides and personal care aides to Medicaid beneficiaries who require some care but do not need nursing home services.  As set forth more fully below, from the time HFC began operations in or about 2008 through at least May 2014, HFC engaged in a fraudulent scheme to enrich itself at Medicaid's expense by knowingly and systematically falsely billing for home health aide and personal care aide services that HFC knew or should have known were not in fact provided to Medicaid recipients.  To carry out its scheme, HFC directed its employees to deliberately circumvent its own aide attendance verification systems and internal controls that purported to ensure that aides were present in the homes of the Medicaid recipients to whom they were allegedly providing care, before HFC billed for these services.

5.     HFC's rampant, widespread, and systemic disregard and circumvention of virtually all of its own purported internal controls, as well as the statutes and regulations of the

Medicaid program, resulted in HFC's knowing submission of thousands of false claims for services in order to generate millions of dollars of revenue at the Medicaid program's expense.

6.     From the time HFC began operations in or about 2008 until in or about January 2012, HFC policies and procedures ostensibly required HFC Coordinators, who were employees supervising HFC's home health aide and personal care aides, to call the home of the Medicaid recipient, or "client,"[1] at least once during an aide's shift to verify with the client and the aide that the aide was present in the client's home, where HFC's services were to be provided.  In addition, HFC's stated policy required aides to submit a paper timesheet signed by the aide and the client documenting the amount of time that the aide had cared for the client.

7.     In reality, however, in order to maximize HFC's billings and revenue, HFC Coordinators routinely failed to contact the client or the aide assigned to them during the aide's scheduled shift.  Further, these Coordinators deliberately disregarded obvious discrepancies and inconsistencies in the timesheets submitted by aides to supposedly document their services, including but not limited to, by ignoring obviously inconsistent signatures purporting to be from the same client or aide.

8.     Beginning in or about January 2012, New York law required agencies such as HFC to utilize an electronic attendance verification system for certain home health aide and personal care aide services.  The purpose of the law was to prevent fraud, waste and abuse in the Medicaid program's home health services by requiring providers to use electronic means to verify whether a service was provided to an eligible Medicaid recipient.  To ostensibly meet state law requirements, HFC installed an automated electronic telephone attendance verification

---

[1] HFC records alternately use the terms "client" and "patient" to refer to Medicaid recipients to whom HFC purportedly rendered services to, and billed for said services.  This Complaint will use the term "client" for consistency.

system that required aides to verify their attendance at a client's home by clocking in and clocking out at the beginning and end of their shifts by calling in to a central HFC number from the client's telephone.  This system was designed to ensure that HFC would not seek Medicaid payment for scheduled services if the system did not log the aide's call from the client's home phone at both the start and end of the aide's shift, unless HFC provided a reasonable and legitimate justification for the aide's failure to do so.

9.    From the time that HFC installed the electronic telephone attendance verification system, HFC deliberately subverted the system in a myriad of ways in order to bill Medicaid for services of aides who failed without explanation or excuse to contemporaneously clock in and out of their shifts by calling from the client's number.

10.    In order for HFC to bill and receive Medicaid reimbursement for these services, HFC executives trained and instructed Coordinators to fabricate entries for nonexistent calls from aides in HFC's attendance software, or to manually make a false modification to an entry of the aide's existing call as recorded in the software.  HFC manipulated its internal data in order to make its records appear as though the aide had properly clocked in and out of his or her shifts to render services, when in fact he or she had not.

11.    HFC's scheme to circumvent and manipulate its electronic attendance verification procedures had multiple facets, including: a) falsely creating or modifying call entries to bill for the services of aides despite HFC scheduling them to be in two places at the same time (see *infra* at § (A)(f)(ii)); b) falsely creating or modifying call entries to bill for the services of aides who clocked in or out of their shifts from the homes of clients other than the client they were supposed to be caring for (see *infra* at § (A)(f)(iii)); c) falsely creating or modifying call entries of aides who arrived late or left early on their shifts in order to bill for the

nominal duration of the aide's shift (see *infra* at § (A)(f)(v)); and d) falsely creating or modifying call entries to bill for the services of aides who repeatedly failed to clock in or clock out of their shifts over a period of months or years without explanation or excuse (see *infra* at § (A)(f)(vi)).

12.    HFC made no effort to verify the aides' attendance when the aide failed to properly clock in or out of their shift, and billed for the purported services based on the manipulated attendance records alone.

13.    As a result of HFC's deliberate circumvention of its attendance verification systems and procedures, HFC repeatedly billed for home health aide and personal care aide services purportedly provided by aides during times when the aide could not have been present with the client, including times when the aide or the client was traveling outside of the country.

14.    In a further effort to circumvent HFC's own electronic attendance verification system, HFC Coordinators in multiple instances entered telephone numbers belonging to HFC aides into the attendance verification system as if they were the telephone numbers of the clients that these aides were assigned to care for. (see *infra* at § (A)(f)(iv)).  Through these false inputs, HFC deliberately circumvented its attendance verification system by causing it to function as if the aide had called from the client's home to clock in and out of their shift, when in fact the aide had called from their own phone at a location of the aide's choosing.  In so doing, HFC prevented its electronic verification system from automatically identifying the entry as an exception, which was designed to trigger further verification review.  HFC in turn billed for the services of these aides, turning a blind eye to the fact that that it had reason to believe that its aides had not been present with their clients during their scheduled shifts.

15.    HFC executives were fully aware of these actions of the Coordinators, and in fact trained and instructed Coordinators to allow aides to evade HFC attendance verification

procedures. Before HFC installed the electronic attendance verification system, HFC's purported verification procedures required Coordinators to call aides at the clients' homes, to ensure they were present to provide services. During this time, Michael Gurevich ("Gurevich"), HFC Vice President, prohibited Coordinators from calling certain aides, referred to within HFC as "VIP" aides, or from calling those aides' clients, to confirm that the aides had worked their scheduled shifts. Gurevich also trained and instructed HFC's Coordinators to submit these aides' nominally scheduled services for billing even though the Coordinators had no reasonable basis to believe that these services had been rendered, and HFC fraudulently billed for these purported services.

16.    Again, after HFC installed the electronic attendance verification system, Gurevich instructed Coordinators that "VIP" aides were not required to use the system and prohibited Coordinators from contacting the exempted aides or their clients when these aides failed to properly clock in or out of their shifts. Instead, Gurevich instructed Coordinators either to fabricate an entry of a nonexistent call in the electronic attendance verification system, or to falsely modify an entry for an existing call, in order to make it appear as though these exempted aides had properly clocked in and out of their shifts.

17.    The failure of HFC aides to clock in and out of their shifts was widespread. To illustrate, HFC's electronic attendance records show that HFC submitted at least $9,635,000.00 in claims for home health aide and personal care aide services to Medicaid recipients that were not rendered, as evidenced by cases in which an HFC aide failed to make any call to clock to in or out of their shift, failed to call from their client's home to clock in or out, failed to clock in or out at the correct time, or otherwise failed to properly clock in or out of their shift.

6

18.    In addition, HFC falsely billed for services of untrained and unqualified individuals who worked under false identifies stolen from qualified aides, and continued to do so even after being informed by multiple persons whose identifies had been used that HFC was billing for services in their names that they had never provided.  In a prime example of HFC's disregard for the safety of its clients and the integrity of the Medicaid program, Alexander Kiselev, HFC's President, blamed the victims of the identity theft for HFC's false billings, and failed to take any steps to determine who, if anyone, had provided services to these clients, or to reverse any billings for services provided by unknown and unqualified individuals.

19.    As a result, HFC knowingly submitted false claims for payment for these purported services to Certified Home Health Agencies and Managed Care Organizations with which HFC contracted to provide services, thereby causing these entities to submit false claims to the Medicaid program for these services.

## II.    JURISDICTION AND VENUE

20.    Eric T. Schneiderman is the Attorney General of the State of New York.  He is authorized to recover three times the amount of damages sustained by the State on account of Defendants' false and fraudulent claims and statements along with civil penalties of between $6,000 and $12,000 per violation pursuant to the NY FCA, N.Y. State Fin. Law §§ 189, 190(1), to recover treble damages for overpayments of public funds obtained by means of false statements or other fraudulent schemes, N.Y. Social Services Law § 145-b(2), to prosecute and institute all actions and proceedings in which the State is interested, N.Y. Executive Law § 63(1), and to seek restitution for repeated or persistent fraudulent or illegal business acts or practices, N.Y. Executive Law § 63(12).

21.    The United States is entitled to recover treble damages and penalties under the FCA.

22.    On or about June 1, 2010, Relator Milan Nus filed a complaint on behalf of himself, the United States and the State of New York alleging violations of Federal and State False Claims Acts.

23.    The United States and the State conducted an investigation into the allegations in Mr. Nus's Complaint in accordance with N.Y. State Fin. Law § § 190(2)(c)(i). In the course of this investigation, the United States and the State, *inter alia*, subpoenaed records from Defendant HFC and third parties, and took testimony from Defendants Alexander Kiselev and Michael Gurevich, as well as current and former HFC employees, pursuant to NY Executive Law § 63(12).

24.    On September 30, 2016, the United States and the State both filed a Notice of Intention to Intervene in this action in part, and to file a Complaint in Intervention pursuant to N.Y. State Fin. Law § § 190(2)(c)(i) and 190(2)(d).  On October 4, 2016, the Court entered an Order granting the United States and the State of New York 60 days from the date of the Order to file its Complaint in Intervention, and subsequently extended this filing deadline to December 19, 2016.

25.    This Court has subject matter jurisdiction over the claims asserted by the United States under 28 U.S.C. §§ 1331, 1332 and 1345, and 31 U.S.C. §3730; and over the claims asserted by the State pursuant to 31 U.S.C. § 3732(b) because the action arises from the same transaction or occurrence as an action brought under 31 U.S.C. § 3730, and this Court has supplemental jurisdiction to entertain the state statutory, common and equitable causes of action pursuant to 28 U.S.C. § 1367(a).

26.     Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 139l(c), because HFC's principal place of business is in this District and some of the false or fraudulent acts occurred in this District.

## III.   PARTIES

27.     Plaintiff United States of America brings this action on behalf of HHS and CMS, which is responsible for overseeing the Medicaid program.

28.     Plaintiff State of New York was at all times relevant to this action a sovereign state of the United States of America.

29.     Relator Milan Nus, a resident of New York, is a former employee of HFC.

30.     Defendant HFC is a corporation incorporated in the State of New York with its principal place of business at 3051 Brighton 3rd Street, Brooklyn, New York, 11235.

31.     Defendant Alexander Kiselev is the President, and a co-owner with his wife, of HFC., and is a resident of the State of New Jersey.

32.     Defendant Michael Gurevich a/k/a Michail Gurevich a/k/a Mikhail Gurevich is the former Vice President of HFC, and is a resident of the State of New York.

## IV.   THE LAW

### A. The FCA

33.     The FCA provides for the award of treble damages and civil penalties for, inter alia, knowingly causing the submission of false or fraudulent claims for payment to the United States Government.  31 U.S.C. §3729(a)(1) (2008).

34.     The FCA provides, in pertinent part, that any person who:

(1)(A) knowingly presents, or causes to be presented to an officer or employee of the United States Government or member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(1)(C) conspires to commit a violation of Section 3729(a).

* * *

is liable to the United States Government, for a civil penalty of not less than $5,000 and not more than $10,000.00, plus three times the amount of all damages which the United States Government sustains because of the act of that person.

Pursuant to the Federal Civil Penalties Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), the FCA civil penalties have been adjusted to $5,500 to $11,000 per false claim for violations occurring on or after September 29, 1999, 64 Fed. Reg. 47099, 47103, except that the penalties have been adjusted to $10,781 to $21,563 for violations occurring after November 2, 2015 for which penalties are assessed after August 1, 2016, 81 Fed. Reg. 42491.

35.    The terms "knowing" and "knowingly" are defined to mean "that a person with respect to information, (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard for the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii).  These terms "require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B).

**B.  The NY FCA**

36.    The NY FCA provides, in pertinent part, that any person who:

a)  knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

b)  knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

c)  conspires to commit a violation of [paragraphs (a) or (b)] of this subdivision; [or]

* * *

h)  knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government, or conspires to do the same;

shall be liable to the state or a local government, as applicable, for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three times the amount of all damages, including consequential damages, which the state or local government sustains because of the act of that person.

N.Y. State Fin. Law § 189(1).

37.  ″Knowing and knowingly″ means that with, respect to information, a person:

has actual knowledge of the information;
acts in deliberate ignorance of the truth or falsity of the  information; or
acts in reckless disregard of the truth or falsity of the information.

N.Y. State Fin. Law § 188(3)(a).

38.  The NY FCA further provides that:

"Obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.

N.Y. State Fin. § 188(4).

39.  Under the NY FCA, a ″claim″:

(a)  means any request or demand, whether under a contract or otherwise, for money or property that:

(i)  is presented to an officer, employee or agent of the state or a local government; or

(ii)  is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the state or a local government's behalf or to advance a

11

state or local government program or interest, and if the state or local government (A) provides or has provided any portion of the money or property requested or demanded; or (B) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

N.Y. State Fin. Law § 188(1). Accordingly, a claim for payment for services provided to Medicaid recipients is false regardless of whether the claim is made directly to the Medicaid program, or is made to a contractor, managed care entity, or other recipient of State Medicaid funds.

### C.   N.Y. Social Services Law § 145-b

40.   N.Y. Social Services Law § 145-b(1)(a) provides, in pertinent part, that:

It shall be unlawful for any person, firm or corporation knowingly by means of a false statement or representation, or by deliberate concealment of any material fact, or other fraudulent scheme or device, on behalf of himself or others, to attempt to obtain or to obtain payment from public funds for services or supplies furnished or purportedly furnished pursuant to this chapter.

41.   "Statement or representation," as used within Social Services Law § 145-b(1)(a) includes, but is not limited to: a claim for payment made to the state, a political subdivision of the state, or an entity performing services under contract to the state or a political subdivision of the state; an acknowledgment, certification, claim, ratification or report of data which serves as the basis for a claim or a rate of payment, financial information whether in a cost report or otherwise, health care services available or rendered, and the qualifications of a person that is or has rendered health care services. N.Y. Social Services Law § 145-b(1)(b).

42.   For violations of Social Services Law §145-b(1), the State is entitled to recover treble damages, penalties, and costs. N.Y. Social Services Law § 145-b(2).

### D.  N.Y. Executive Law § 63(12)

43.     New York Executive Law § 63(12) provides, in pertinent part, that:

> Whenever any person shall engage in repeated fraudulent or illegal acts or otherwise demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business, the attorney general may apply . . . for an order enjoining the continuance of such business activity or of any fraudulent or illegal acts,     directing     restitution     and     damages     .     .     .     .

**E.   N.Y. Executive Law § 63-c**

44.     New York Executive Law § 63-c(1) provides, in relevant part, that:

> Where any money, funds, credits, or other property, held or owned by the state, or held or owned officially or otherwise for or on behalf of a governmental or other public interest, . . . has heretofore been . . . without right obtained . . . an action to recover the same, or to recover damages or other compensation for so obtaining . . . of the same, or both, may be maintained by the state in any court of the state, or before any court or tribunal of the United States, or of any other state, or of any territory of the United States, or of any foreign country, having jurisdiction. . . .

**F.   The Medicaid Program – Federal Participation**

45.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  The federal involvement in Medicaid is to provide matching federal funds and to ensure that states comply with minimum standards in the administration of the program.

46.     The federal Medicaid statute sets the minimum requirements for state Medicaid programs to qualify for federal funding which is called federal financial participation.  42 U.S.C. § 1396, et seq.

47.     At all times relevant hereto, the United States provided funds to New York for its Medicaid program, which New York administers through the New York State Department of Health ("DOH").  New York State pays health care providers according to established rates, and the federal government then pays a statutorily established share of "the total amount expended . . . as medical assistance under the State plan." See 42 U.S.C. § 1396b(a)(l).

48.    New York State's Medicaid program is required to have a fraud detection program, and a state plan that provides for exclusion of persons who have committed fraud.  Cf. 42 C.F.R. § 455.

**G.  New York State Medicaid Regulations**

49.    New York's Medicaid program covers home health aide services and personal care aide services.  See EMedNY New York State Home Health Manual Policy Guidelines, Version 2012-1.[2]

50.    Before submitting claims for payment to the New York State Medicaid program, whether in paper or electronic form, providers, including Certified Home Health Agencies and Managed Care Organizations, are required to first sign a Certification Statement for Provider Billing Medicaid (hereinafter, "Certification Statement"). See EMedNY New York State Medicaid General Billing Guidelines.  In the Certification Statement, the provider certifies that, for all claims submitted to Medicaid, "I (or the entity) have furnished or caused to be furnished the care, services, and supplies itemized and done so in accordance with applicable federal and state laws and regulations."

51.    The Certification Statement further provides that, for all claims submitted to Medicaid, "the persons providing services, care and supplies have the necessary licensing, certification, training and experience to perform the claimed services," and that "all records pertaining to the care, services and supplies provided including all records which are necessary to disclose fully the extent of care, services and supplies provided to individuals under the [Medicaid program] will be kept for a period of six year from the date of payment . . . ."

---

[2] EMedNY Provider Manuals are available at www.emedny.org

52.     Accordingly, providers must affirmatively certify, as a condition of payment of the claims submitted for reimbursement by Medicaid, compliance with applicable federal and state laws and regulations.

53.     A provider must renew its Certification Statement periodically by signing a new Certification Statement.  The Certification Statement last signed by the provider remains in effect for all claims until the provider signs a new Certification Statement.

54.     Since in or about 2007, the Certification Statement has applied to all claims submitted to Medicaid, whether submitted electronically or on paper.

55.      18 N.Y.C.R.R. § 515.2(a) prohibits as an "unacceptable practice" conduct that is contrary to:

> (3) the official rules and regulations of the Departments of Health, Education and Mental Hygiene, including the latter department's offices and division, relating to standards for medical care and services under the [Medicaid] program; or
>
> (4) the regulations of the Federal Department of Health and Human Services promulgated under title XIX of the Federal Social Security Act.

56.     More specifically, "an unacceptable practice is conduct which constitutes fraud or abuse," and includes "false claims, submitting or causing to be submitted, a claim or claims for unfurnished medical care, services or supplies." 18 N.Y.C.R.R. § 515.2(b)(l)(i)(a).

57.     An unacceptable practice also includes "making, or causing to be made any false, fictitious or fraudulent statement or misrepresentation of material fact in claiming a medical assistance payment, or for use in determining the right to payment." 18 N.Y.C.R.R. § 515.2(b)(2)(i).

58.     New York Medicaid regulations require providers to ". . . submit claims for payment only for services actually furnished and which were medically necessary or otherwise

authorized under the Social Services Law when furnished and which were provided to eligible persons." 18 N.Y.C.R.R. § 504.3(e).

59.     New York Medicaid regulations further require all providers "to prepare and maintain contemporaneous records demonstrating [their] right to receive payment under the medical assistance program and to keep for a period of six years from the date the care, services or supplies were furnished, all records necessary to disclose the nature and extent of services furnished and all information regarding claims for payment submitted by, or on behalf of the provider and to furnish such records and information upon request, . . . to the Deputy Attorney General for Medicaid Fraud Control." 18 N.Y.C.R.R. § 504.3(a).

60.     18 NYCRR § 505.23, governing the provision of home health aide services, further provides that "[N]o payment will be made unless the claim for payment is supported by documentation of the time spent providing services to each recipient."

61.     18 NYCRR § 515.2 also provides that "It is an unacceptable practice to [f]ail to maintain or to make available for purposes of audit or investigation records necessary to fully disclose the medical necessity for and the nature and extent of the medical care, services or supplies furnished, or to comply with other requirements of this Title." 18 NYCRR § 515.2(b)(6).

62.     Pursuant to 18 NYCRR § 518.1(c) "overpayment includes any amount not authorized to be paid under the medical assistance program, whether paid as the result of inaccurate or improper cost reporting, improper claiming, unacceptable practices, fraud, abuse or mistake." Accordingly, the Medicaid program will not knowingly pay claims resulting from unacceptable practices, and all claims for payment to Medicaid resulting from unacceptable

16

practices are in violation of a material condition of payment of the New York State Medicaid Program.

63.     Title 18 provides further that "[n]o payments will be made to or on behalf of any person for the medical care, services or supplies furnished . . . in violation of any condition of participation in the program," nor will payments be made for "for any medical care, services or supplies ordered or prescribed in violation of any condition of participation in the program."  18 N.Y.C.R.R. §§ 515.5(a), (b).

64.     HFC's violations of the laws, rules and regulations of the Medicaid program were material.  Had the Medicaid program known that HFC had not provided services for which claims were submitted to Medicaid, or that HFC had failed to maintain documentation of services for which claims were submitted to Medicaid, the Medicaid program would not have paid for such services.

**H.   Medicaid Coverage and Billing for Home Healthcare Services**

65.     Under the Medicaid program, certain individuals are eligible to receive "home health aide" and "personal care aide" services in their homes.   The services provided by home health aides ("HHAs") may include bathing, dressing, grooming, feeding, catheter and colostomy care, wound care, and the administration of certain medications to maintain the Medicaid recipient's health.

66.     Services provided by personal care aides ("PCAs") are divided into two categories, Level 1 and Level 2.  Level 1 personal care aides are limited to providing basic housekeeping services, such as cooking and cleaning. Level 2 personal care aides provide services similar to those of home health aides, in addition to Level 1 services.

67.     The vast majority of home health services billed for in New York State are funded by the Medicaid program.  All of HFC's services at issue in this Complaint were claimed to have been provided to Medicaid recipients.

68.     HFC is a licensed home care services agency ("LHCSA").  It employs HHAs and PCAs and assigns them to provide services to Medicaid recipients through entities operating as Certified Home Health Agencies, and through Managed Care Organizations which provide services under Managed Long Term Care Plans (discussed further *infra* section J).

69.     Certified Home Health Agencies ("CHHAs") are enrolled Medicaid providers and are entitled to bill the Medicaid program on a fee for service basis for covered home health care services, including HHA services, provided to their Medicaid recipients.

70.     A LHCSA does not bill the Medicaid program directly, but rather, it acts as a subcontractor to the CHHAs with which it contracts.

71.     A LHCSA, here HFC, submits invoices for the services allegedly provided by the aides it employs to the Medicaid recipient's CHHA, and the LHCSA's invoices are claims for purposes of the federal and state False Claims Acts.  The CHHA, in turn, submits requests for payment to the Medicaid program for these services, and pays the LHCSA, here HFC, as provided in the contracts between the CHHA and the LHCSA.

72.     Accordingly, when HFC knowingly submitted false invoices to the CHHA for services that were not rendered or that were rendered in violation of the laws and regulations governing the Medicaid program, HFC knowingly caused the CHHA to submit false claims to Medicaid for these services.

73.     HFC, like all LHCSAs, bills for HHA and PCA services in units representing increments of time. The time increments differ depending upon the particular service provided. Accordingly, one unit may represent fifteen minutes or one hour of service.  In addition, in

instances in which a client is receiving twelve or twenty-four hours of service per day, the services may be billed on a daily basis, with one unit representing one day of care.

74.     HFC, as a for-profit entity, charges a higher rate per unit of service than it pays its aides. In addition, the CHHAs bill Medicaid for the cost of HFC's services with additional fees, thereby costing the Medicaid program even more for each false unit of service generated by HFC.

### I. Medicaid Training Requirement for Home Healthcare Services

75.     At all times relevant to this Complaint, HHAs and PCAs employed by HFC were required to complete minimum training requirements before providing services to Medicaid clients, and services provided by individuals who did not satisfy these training requirements were not eligible for reimbursement by Medicaid. See 18 NYCRR §§ 505.23 (a)(2)(iii); 505.14(e).

76.     To be eligible for Medicaid reimbursement, services must be provided by persons possessing required training and qualifications.

### J. Home Healthcare Provided under Medicaid Managed Care

77.     New York State Medicaid is transitioning into Managed Care, a New York State sponsored health insurance program for people who have little or no income and are eligible for Medicaid. Medicaid recipients enroll in Managed Care plans administered by Managed Care Organizations ("MCO") that provide medical care and other services. MCOs send Medicaid reimbursement payments to providers that are enrolled with or pre-approved by the MCO. MCOs operate Managed Long Term Care Plans ("MLTCPs") which enroll individuals in need of long term care services, such as HHA or PCA services.

78.     The New York State Medicaid program contracts with MLTCPs to provide HHA and PCA services to individuals enrolled in their plans, and pays the MLCTPs a monthly

premium for each member enrolled in the plan to provide these services. The MLTCPs in turn contract with HFC and other LHCSAs to provide HHA and PCA services to plan enrollees on a fee for service basis.  As with CHHAs, HFC bills MLTCPs for its services in units representing increments of time.

79.    During the times relevant here, HFC submitted invoices for the purported services of aides that it employed to the Medicaid recipient's MLTCP and received payment for each service it allegedly provided.  Accordingly, Medicaid funds paid to the MLTCP for services to enrolled recipients are used to pay HFC for HHA and PCA services.

80.    The contracts between MLTCPs and LHCSAs are governed by a Model Contract issued by the New York Medicaid program, which sets forth terms and conditions which are required to be included in any contract between an MLTCP and a LHCSA.

81.    Services provided to Medicaid recipients who are enrolled in an MLTCP are known as "encounters."  Medicaid reimbursement payments from an MLTCP to a provider, such as HFC, for these services are known as "encounter payments."

82.    All MLCTPs are contractually required to provide the Medicaid program with a record of the encounter payments they make to providers with the funds they receive from Medicaid.  MLTCPs are further required to submit an attestation that the record of encounter payments is accurate and complete to the best of their knowledge.

83.    Insofar as the New York State Medicaid program contracts with the MLTCP on a capitated, per recipient per month basis, HFC's fraudulent scheme detailed below results in higher costs to the New York State Medicaid program, as the capitated rates paid by Medicaid to the MLTCPs are directly impacted by the amount the MLTCPs must spend on home health care and other services provided to recipients enrolled in their plans.  Thus, the capitated rate paid by

Medicaid to the MLTCPs is artificially inflated when HFC fraudulently bills and receives payment for services which are not provided or are provided in violation of Medicaid program laws and regulations.

84.    The New York State Medicaid program requires all MCOs which it contracts with, including MLTCPs, to require all of their member providers and subcontractors to abide by the laws and regulations of the Medicaid Program, even if the provider or subcontractor itself is not an enrolled Medicaid provider. *See* Model MLTCP Contract Sec. VII(C)(10)(x)

85.    Accordingly, an MLTCP cannot use Medicaid monies that it receives to pay for services not rendered or to pay for services rendered in violation of Medicaid program laws and regulations.

86.    As noted, *supra*, the terms of the contracts between MLTCPs and providers such as HFC are subject to the requirements set forth in the Model Contract between the New York State Medicaid program and the MLTCP. Section VII(C)(10)(i) of the Model MLTCP Contract states that all contracts between MLTCPs and providers of covered services shall include the following provision:

(a)    Any services or other activities performed by a provider in accordance with a contract between the provider and the [MLTCP] will be consistent and comply with . . . applicable state and federal laws and regulations.

87.    The MLTCP Model Contract further provides that the MLTCP "shall require its subcontractors to maintain appropriate records related to services provided to Enrollees. . . ." MLTCP Model Contract Section VIII(A)(2)(a).

**K.   Electronic Attendance Verification for Home Health Aides and Personal Care Aides**

88.     Beginning in or about January 2012, N.Y. Soc. Serv. Law 363-e required claims and encounters for home health and personal care services submitted by a Participating Provider to be reviewed and verified by a "verification organization" prior to the submission of the claim or encounter for payment.   N.Y. Soc. Serv. Law § 363-e (McKinney).   This requirement continues to the present day.

89.     Pursuant to N.Y. Soc. Serv. Law § 2(38)(i) (McKinney), a Participating Provider includes any CHHA or LHCSA with total Medicaid reimbursements, including through the Medicaid managed care program, exceeding fifteen million dollars ($15,000,000) per calendar year.

90.     Pursuant to N.Y. Soc. Serv. Law § 2(38)(f)(McKinney), a "Verification Organization" is defined as:

an entity, operating in a manner consistent with applicable federal and state confidentiality and privacy laws and regulations, which uses electronic means including but not limited to contemporaneous telephone verification or contemporaneous verified electronic data to verify whether a service or item was provided to an eligible Medicaid recipient. For each service or item the verification organization shall capture:

(i) the identity of the individual providing services or items to the Medicaid recipient;

(ii) the identity of the Medicaid recipient; and

(iii) the date, time, duration, location and type of service or item.

91.     The purpose of the law is to prevent fraud, waste and abuse in the Medicaid program's home health services by requiring providers to use electronic means to verify whether a service was provided to an eligible Medicaid recipient.

92.     Accordingly, pursuant to N.Y. Soc. Serv. Law 363-e, the New York State Medicaid program requires Participating Providers to utilize a Verification Organization, which in turn use electronic means, such as contemporaneous telephone verification, to ensure that

HHA and PCA services had been provided before such claims may be submitted for payment to the Medicaid program. Electronic verification of HHA and PCA services is known as Electronic Visit Verification ("EVV"), and the software which performs these tasks is known as EVV software.

93.    In order to comply with N.Y. Soc. Serv. Law 363-e, a LHCSA that qualifies as a Participating Provider must utilize EVV software to verify whether its services were provided to its Medicaid recipients. A LHCSA must also utilize EVV software for all services that it provides which are ultimately billed to Medicaid by CHHAs which qualify as Participating Providers, even if the LHCSA itself does not qualify as a Participating Provider.

94.    The EVV software electronically transmits attendance data to the Verification Organization, which is responsible for reviewing this data and verifying that the aide rendered the scheduled services to the client.   A LHCSA may utilize EVV software which is provided by the Verification Organization itself.  Alternatively, a LHCSA may choose to use a different EVV software product, so long as the data generated by the EVV software can be reviewed and verified by the Verification Organization's computer systems.

## V.    FACTUAL ALLEGATIONS

## A.    HFC REPEATEDLY AND SYSTEMATICALLY BILLED FOR SERVICES WHICH IT KNEW OR SHOULD HAVE KNOWN WERE NOT RENDERED

95.    Defendant HFC, from the time it began operations in 2008 through at least 2014, has knowingly and systematically billed for services that it knew or should have known were not rendered.

96.    Although HFC has utilized different attendance verification systems and procedures throughout its years of operation, HFC has repeatedly and systematically assisted the aides it employs with evading every one of these systems and procedures.

97.     HFC's attendance verification systems and procedures are, and have been, a sham, put in place by HFC to make it appear as though HFC has a basis for billing for services when in fact HFC, since its inception, has deliberately avoided taking any reasonable steps that could lead it to confirm that its aides had not rendered the services for which HFC was billing.

98.     As a result of HFC's scheme to evade its own attendance verification systems and procedures, HFC has repeatedly and systematically billed for services that it knew or should have known were not rendered.

99.     Defendants Alexander Kiselev and Michael Gurevich, HFC's President and Vice President, respectively, were both aware of HFC's sham attendance verification systems and procedures, and Michael Gurevich repeatedly directed HFC employees to subvert these systems and procedures.    Kiselev and Gurevich deliberately turned a blind eye to HFC's sham verification practices so that HFC would continue to generate millions in revenue from Medicaid through HFC's fraudulent billings.

   a) **HFC Utilized a Sham Timesheet Attendance Verification Procedure During Its Early Years of Operation**

100.    Prior to about January 2012, HFC lacked any type of electronic or computerized system to monitor whether its home health aides ("HHA") and personal care aides ("PCA") were providing the scheduled services.

101.    Rather, from the time HFC began providing home health services in or about 2008 until in or around January 2012, HFC purportedly relied upon its Coordinators to ensure that HFC aides had rendered the scheduled services.

102.    HFC Coordinators were responsible for scheduling HHA and PCA services, and for supervising the aides assigned to them.

103.    Prior to about January 2012, HFC purportedly had a 2-step policy in place to ensure aide attendance, which (1) required Coordinators to confirm that aides were present for their shifts by calling the client's home at least once during the scheduled service, and (2) required HHAs and PCAs to complete timesheets reflecting the services they provided to recipients each week.

104.    HFC aides were supposed to submit their timesheets to their Coordinators, who would then utilize the information to confirm that services were provided and to submit HFC invoices for these services to the CHHA or MLTCP.  These timesheets formed the basis for the invoices that HFC submitted to the CHHAs and MLTCPs for these alleged services.

105.    The timesheets used by HFC were preprinted form timesheets which required aides to contemporaneously record the services they had purportedly provided to the clients for each day of the week by marking the appropriate boxes on the timesheets.

106.    HFC HHAs and PCAs were instructed to fill out a unique weekly timesheet for each recipient they rendered services to in a given week.  Thus if an aide claimed to have rendered services to multiple clients in a week, the aide was required to fill out multiple timesheets.

107.    Each aide was required to fill out the pre-printed forms on a daily basis (Saturday through Friday).  The aide was responsible for filling in his/her name and position along with the name, address and phone number of the client they were seeing.  Further, the aide was supposedly required to fill in the dates of services (Saturday through Friday) plus the time the aide arrived at the client's home, the time the aide left the client's home and the total hours worked each day for that client.  The aide was then to place a checkmark next to each pre-printed service provided on each day of that week.

108.    In addition, HFC ostensibly required both the aide and the client to sign the timesheet indicating that the services noted on the timesheet had been performed for every day of the week that the aide provided services.  Accordingly, if the aide provided services on all seven days of a single week, the timesheet was supposed to contain seven signatures from both the aide and the client.

109.    In contravention of HFC's purported policy, HFC Coordinators routinely failed to contact by phone either the client or the aide during a scheduled service to confirm that the aide was present and providing services to their clients.

110.    In fact, multiple individuals who worked as HFC Coordinators testified that Michael Gurevich, then the Vice President of HFC, specifically instructed Coordinators that they were not permitted to call certain aides, referred to within HFC as "VIP" aides, or to contact the clients they were assigned to, in order to confirm that the aide was present during the scheduled service.  These Coordinators further testified that Gurevich directed Coordinators to submit the scheduled services of these aides for billing notwithstanding that the Coordinators had no reasonable basis for believing that these aides had actually been present for their shifts.

111.    According to the testimony of a former HFC Coordinator, if a Coordinator disobeyed Gurevich's instructions and attempted to contact one of the aides Gurevich had identified, Gurevich would reprimand this Coordinator and reassign the aide to another Coordinator.

112.    In addition, HFC failed to take even cursory steps to verify the authenticity or accuracy of the timesheets purporting to document the services of its aides.

113.    As a result, the timesheets purportedly supporting HFC's billings are false, and riddled with inaccuracies and inconsistencies.

114.    Many of the signatures on these timesheets purporting to be from the same aide or client are obviously inconsistent with each other, and in many instances the services claimed to be provided on these timesheets could not have been rendered on the dates listed, indicating at a minimum that these timesheets do not accurately reflect the services rendered by HFC aides, and strongly suggesting that these timesheets were fabricated by individuals at HFC in order to justify billing for these services.  In either event, the timesheets are false.

115.    HFC either chose to ignore these obvious inconsistencies and irregularities, or never reviewed the timesheets at all.  As a result, HFC committed unacceptable practices under the Medicaid program regulations, knowingly submitted thousands of false claims for purported home health aide and personal care aide services to CHHAs and MLTCPs, and knowingly caused the CHHAs and MLTCPs to submit false claims to Medicaid.

**b)  HFC Repeatedly Billed for Services That Were Not Rendered As a Result of Its Sham Attendance Verification Procedure**

116.    HFC repeatedly falsely billed for services that were never rendered as a result of its deliberate circumvention of its purported attendance verification procedures.

**i)  HFC Falsely Billed for Services of Aides 1 and 2 While They Were Traveling Overseas**

117.    In fact, on multiple occasions HFC knowingly submitted false claims for services purportedly provided by aides who were traveling overseas at the time of service.

118.    As but one example, HFC submitted false claims to Guildnet's MLTCP and received a total of $14,616.00 for services purportedly provided by Aide 1 to clients LS and RS[3]

---

[3] In order to avoid disclosing confidential healthcare information, the Complaint in Intervention refers to individual HFC clients by their initials, and refers to individual HFC aides and Coordinators by number. A list of all individuals referred to by initial or number in this Complaint along with their corresponding names will provided by letter to counsel for Defendants.

during the periods from November 21, 2010 to December 20, 2010, and from June 25, 2011 through September 7, 2011, that Aide 1 never provided.  HFC also knowingly caused Guildnet's MLTCP to submit false claims to Medicaid for these services. Attached as Exhibit 1 is a table listing each of these claims. [4]

119.    According to records from United States Customs and Border Protection, Aide 1 was traveling outside of the country from November 20, 2010 to December 21, 2010 and from June 24, 2011 to September 8, 2011, and she therefore could not have rendered any of these services.

120.    As another example, HFC submitted false claims to Guildnet's MLCTP and received $1,079.12 for services purportedly provided by Aide 2 to GE and AT from May 11 through May 24, 2011 that Aide 2 never provided.  HFC also knowingly caused Guildnet's MLTCP to submit false claims to Medicaid for these services.  Attached as Exhibit 2 is a table listing each of these claims.

121.    According to records from United States Customs and Border Protection, during the period from May 10, 2011 through May 25, 2011, Aide 2 was traveling outside of the country and he therefore could not have rendered any of these services.

---

[4] In order to avoid disclosing confidential healthcare information, the aide name, patient name and patient date of birth have been redacted from the attached exhibits.  In addition, the data in the tables attached as exhibits to this Complaint is taken from HFC's invoice records.  However, the amounts claimed and received by HFC for the services referenced in this Complaint were determined both from HFC's invoice records and from records of Encounter Payments made by MLTCPs to HFC.  In most instances, the amounts listed in HFC's invoice records and in the Encounter Payment records are the same for a given service.  In certain instances, the amount billed by HFC according to HFC's invoice records is slightly higher than the amount paid by the MLTCP as reflected in the Encounter Payment record, in which case the Complaint lists the lower of the two amounts.  Accordingly, the amount listed in the body of the Complaint may be slightly lower than the amount listed in the tables attached as exhibits.

**c) HFC Had No Basis For Relying Upon The Timesheets Purportedly Submitted by Aides as Documentation of Services Rendered**

122.    HFC's practice of falsely billing for services that were not rendered directly resulted from HFC's evasion of its own purported controls in multiple ways as set forth above, including its failure to review the timesheets it purported to rely upon when billing for services, or to take any other steps to ensure that services were being rendered.

**i) Timesheets Purporting to Document Services of Overseas Aides 1 and 2 Are Not Credible On Their Face**

123.    In fact, HFC's timesheets purporting to account for Aide 1's services during the period when she was traveling outside of the country show glaringly obvious discrepancies.   In particular, the signatures on these timesheets purporting to belong to Aide 1 and to clients LS and RS are not consistent from one timesheet to the next, indicating that these signatures do not belong to Aide 1 or LS or RS.

124.    For example, the aide and client signatures on the timesheet purporting to document service from Aide 1 to LS  from July 2 through July 8, 2011, the timesheet purporting to document service from Aide 1 to LS from July 9 through July 15, 2011, and the timesheet purporting to document service from Aide 1 to LS from July 16 through July 22, 2011, show obvious variations.[5]

125.    In addition, there are substantial variations between these timesheets in the services purportedly performed by Aide 1.  According to the timesheet for the week of July 16, 2011, Aide 1 was scheduled to service LS from 12PM to 6PM on every day that week. However, according to this timesheet, during these six hour shifts Aide 1 only purportedly

---

[5] Copies of the timesheets referenced in this Complaint will be provided to counsel for Defendants upon request.

reminded LS to take his medications, assisted him with showering, cooked meals, and did laundry.

126.    The meager set of tasks listed on the July 16 timesheet stands in stark contrast to the tasks Aide 1 purportedly performed during her shift with LS the prior week. According to the timesheet for the week of July 9, 2011, Aide 1 cleaned LS 's kitchen and bathroom, changed his bed, tidied his room, and washed dishes every single day during the week of July 9, 2011, and additionally vacuumed, swept, mopped, dusted, and shampooed LS's hair on multiple days that week. With the exception of the bathroom cleaning, according to the July 16 timesheet Aide 1 was not purported to have performed any of these tasks on any day that week.

127.    HFC therefore knew, or should have known, at the time it submitted claims for Aide 1's services during the period when she was out of the country that Aide 1 had not rendered these services.

128.    The inconsistent signatures on Aide 1's timesheets are not limited to the specific periods discussed above. For example, the aide signatures on the timesheet for Aide 1's services beginning the week of June 5, 2010, the timesheet for Aide 1's services beginning the week of June 12, 2010, the timesheet for Aide 1's services beginning the week of April 24, 2010, and the timesheet for Aide 1's services beginning the week of May 15, 2010 show obvious variations.

129.    Indeed, in certain of the timesheets purporting to document Aide 1's services, the date listed does not even match the day of the week. For example, two timesheets purport to document services by Aide 1 to LS and RS on Saturday, June 3 through Friday, June 9, but neither timesheet specifies the year of service.

130.    June 3rd has not fallen on a Saturday since 2006, before HFC began to provide services to LS or RS.  Accordingly, it is impossible for either of these timesheets to accurately reflect the day and date of service.

131.    HFC either deliberately ignored the inconsistencies and irregularities discussed above when reviewing Aide 1's timesheets, willfully avoided reviewing Aide 1's timesheets at all, or caused its agents to falsify these timesheets.

132.    Timesheets purporting to account for Aide 2's services during the period when he was out of the country similarly show inconsistent signatures.

133.    For example, the aide signatures on the timesheet purporting to document Aide 2's services rendered to client AT from May 14 to May 20, 2011, and the timesheet purporting to document Aide 2's services rendered to client GE on May 14, 2011 show obvious variations.

134.    In addition, no boxes are checked indicating services on the timesheet purporting to document services to GE on May 14, 2011, indicating that Aide 2 performed no services for GE during his entire six hour shift.

135.    HFC therefore knew, or should have known, at the time it submitted claims for Aide 2's services during the period when he was out of the country that Aide 2 had not rendered these services.

136.    The variations and inconsistencies in Aide 2's timesheets are not limited to the specific period discussed above.

137.    For example, the aide signatures on the timesheet for services rendered by Aide 2 to GE on March 5, 2011, and the timesheet for services rendered by Aide 2 to AT from March 5 to 11, 2011, show obvious variations.

138.    HFC either deliberately ignored the inconsistencies and irregularities discussed above when reviewing Aide 2's timesheets, willfully avoided reviewing Aide 2's timesheets at all, or caused its agents to falsify these timesheets.

### ii)    Timesheets Purporting to Document Services of Other HFC Aides Are Similarly Not Credible

139.    Multiple other timesheets that HFC purportedly relied upon to bill for home health aide and personal care aide services contain obviously incorrect and even absurd information on the face of the documents, such that no reasonable person would have relied upon such records as documentation of services rendered.

### 1)    HFC Falsely Billed for Services of Aide 3

140.    For example, on three separate timesheets purporting to document services by Aide 3 to three different clients for the week beginning August 14, 2010, the dates inexplicably are written in descending order from the beginning to the end of the week.  Accordingly, the timesheets purport to document services on Saturday, August 14th, Sunday August 13th, and Monday August 12th, and continue to list service dates in descending order through Friday, August 8th.

141.    The aide signatures on these three timesheets also show glaringly obvious variations.

142.    It would strain credulity to accept that Aide 3 would have signed different timesheets each purporting to document services for the same week using noticeably different signatures.

143.    The tasks performed by Aide 3 according to these timesheets reveal yet more discrepancies.  According to the timesheets, Aide 3 took clients AL and VM to an "M.D. Appt" every single day of the week of August 14, 2010, including Saturday and Sunday.  The

timesheets further indicate that Aide 3 took client GL to an "M.D. Appt" every day that same week except for Friday.

144.    There is no record of any physician billing Medicaid for services to AL, GL, or VM on any day during the week of August 14, 2010, let alone every day that week.

145.    In fact, every timesheet produced to the State by HFC purporting to document Aide 3's services to AL falsely indicates that Aide 3 took AL to a doctor appointment on every day that she provided services to him, including Saturday and Sunday. Similarly, every timesheet produced by HFC purporting to document Aide 3's services to GL indicates that Aide 3 took GL to a doctor appointment on every day she provided services except on Fridays.

146.    Finally, all but one timesheet produced by HFC falsely indicates that Aide 3 took VM to a doctor appointment on every day that she provided services to him.

147.    In addition, none of the timesheets produced by HFC purporting to document Aide 3's services to AL, GL, or VM indicates that she ever assisted these clients with bathing or showering.  Yet every one of these timesheets indicates that Aide 3 consistently shampooed these clients' hair every week, three times per week in the case of AL and VM, and twice per week in the case of GL.  No explanation is given for why Aide 3 supposedly needed to help these clients shampoo their hair multiple times per week, but did not need to assist these clients with bathing or showering on even a single occasion.

148.    HFC chose to ignore obviously false information on the face of Aide 3's timesheets, deliberately avoided reviewing these timesheets at all, or caused its agents to falsify the timesheets.

149.    HFC submitted false claims to Guildnet's MLTCP and received $90,340.72 for services purportedly provided by Aide 3 to AL, GL and VM during the period from January 1,

2010 to December 29, 2011.  HFC also knowingly caused Guildnet's MLTCP to submit false claims to Medicaid for these services.  Attached as Exhibit 3 is a table listing each of these claims.

150.    Because of HFC's practice of deliberately ignoring obvious discrepancies and inconsistencies in its timesheets, HFC's timesheets are not a credible or accurate documentation of services of HFC aides, and HFC had no reasonable basis for relying upon these timesheets as documentation of services rendered.

151.    By ignoring obviously false information on the face of the timesheets it claimed to rely upon when billing for services, HFC intentionally disregarded evidence that its aides had not provided these services, or at least showed reckless disregard for whether these services had been rendered.

### d)    HFC's Installation of an Electronic Attendance Verification System Was a Sham

#### i)    HFC Purports to Implement Mandatory Telephone Electronic Attendance Verification

152.    In or about January 2012, HFC installed an electronic visit verification ("EVV") system which required aides to call in to a centralized number to clock in and out of their shifts, and continues to employ an EVV system to this day.

153.    Alexander Kiselev, the President and co-owner of HFC, testified that it was mandatory for all aides to use the EVV system, and that aides who failed to properly utilize this system would be disciplined for their actions.  That testimony was false.

154.    As discussed, *supra*, beginning in or around January 2012, New York State law required the use of EVV for, *inter alia*, all claims submitted by CHHAs which qualified as Participating Providers under the statute. *See* N.Y. Soc. Serv. Law 363-e.

155.    Certain of the CHHAs with which HFC contracted to provide services qualified as Participating Providers during the time period relevant to this Complaint.  These CHHAs in turn required HFC to utilize EVV for all services provided by HFC for which the CHHA submitted claims to Medicaid.

156.    HFC's internal policy as described by Alexander Kiselev purportedly required that aides use the EVV system for all services provided by HFC, not merely services for which claims were submitted by a CHHA that qualified as a Participating Provider.

157.    HFC's EVV system utilized contemporaneous telephone verification, which required aides to make a call from the client's home to a centralized number both at the beginning and at the end of their shifts.

158.    In order to prevent aides from calling in from a location other than the client's home, the EVV system logged the number of the phone used to call in to the system.

159.     HFC's EVV system maintained a database of client names, phone numbers and addresses.  The database contained entries for the client's "home phone" number, as well as up to three additional alternate phone numbers.

160.    HFC was solely responsible for entering the client's home and alternate phone numbers into the EVV system.

161.    If an HFC aide called to clock in or out of their scheduled shifts from any of the client's home or alternate phone numbers inputted by HFC into the EVV system, the EVV system would treat the call as having originated from the client's home.

162.     During the aide's call, the aide was required to enter certain information into the automated system using a touch tone phone, including a unique employee identification number

assigned to the aide, and activity codes corresponding to different tasks which the aide performed for the client during the scheduled shift.

163.    If the aide called to clock in and out of her scheduled shift at the correct time and from the client's home number or the alternate phone numbers inputted by HFC into the EVV, and if the aide correctly entered the required information, HFC's EVV system would automatically verify the aide's attendance during her scheduled shift, which in turn would allow HFC to bill for the scheduled service without taking any further action.

164.    Alternatively, if an HFC aide failed to call to clock in or clock out of their shift, or if the call failed to meet any one of the above requirements, the attendance system would immediately flag the associated scheduled service as an exception, and prevent HFC from billing for the scheduled service unless HFC took further action to resolve the issue and override the exception.

165.    To override the exception, HFC staff could (1) manually create a call in the system in cases where no call had been made by the assigned aide, or (2) manually modify the existing call in cases where the aide's call was not made on time, was not made from the client's phone, or failed to meet the other requirements discussed *supra*.

166.    HFC's EVV system would log the name of the user who created or modified a call in the system, as well as the time that the call was created or modified.

167.    After HFC's electronic verification system was implemented, HFC policy no longer required aides who properly utilized the EVV to submit timesheets documenting the hours they had worked and the services they had rendered.

168.    However, if the EVV generated an exception for a scheduled shift, HFC policy purportedly required the aide to submit a timesheet documenting that he or she had actually worked the scheduled shift before the aide's services could be billed.

169.    From HFC's installation of an EVV in 2012 through at least May 2014, HFC utilized EVV software maintained by a company known as Arrow Solutions.

170.    In or about May 2014, HFC ceased using Arrow Solutions' EVV software and began using EVV software from Care Centa, a company which is owned and controlled by Alexander Kiselev.

171.    The Care Centa software used by HFC operated in a substantially similar manner to the Arrow Solutions software, and HFC's switch to Care Centa EVV software did not meaningfully change  HFC's policies and practices regarding electronic attendance verification.

172.    When the EVV system generated an exception, the HFC Coordinator who was responsible for supervising the aide would shortly thereafter receive a notification of the exception on his or her computer terminal at HFC's offices.

173.    According to the testimony of Alexander Kiselev, HFC policy purportedly required Coordinators to conduct an investigation to determine why an aide had failed to properly clock in or out of her shift immediately upon being notified by the EVV system that an exception had been generated.

174.    According to Mr. Kiselev, this investigation required the Coordinator to, at a minimum, immediately contact the client and the aide to confirm that the aide was present with the client and obtain a reason for the aide's failure to properly clock in or out of her shift.

175.    According to Mr. Kiselev, only if after conducting this investigation the Coordinator determined that there was a legitimate reason for the aide's failure to properly clock

in or out was the Coordinator permitted to then manually modify the prior entry for a call in the attendance system, or to create an entry for a call in the attendance system where none had been made.

176.     In addition, HFC's EVV system ostensibly required Coordinators to input a reason for creating an entry for a nonexistent call or for modifying the entry for a previously recorded call into the system before HFC's system would permit the scheduled service to be billed.

177.     In the vast majority of instances, HFC Coordinators simply recorded that they had "verified" that the aide had arrived and left on time for their shift in order to justify creating or modifying a call in the EVV system. However, on some occasions HFC Coordinators would include a purported explanation for the aide's failure to clock in or out, such as, for example, that the aide had experienced "phone trouble."

> **ii)     HFC Deliberately Circumvented Its Electronic Attendance Verification Procedures From the Time that They Were Implemented**

178.     In direct contravention of HFC's purported policy, HFC routinely permitted its aides to evade the requirement that they clock in and out of their shifts without taking any steps to determine whether the services had been rendered.

179.     To allow HFC aides to avoid calling to clock in and out of their shifts, HFC Coordinators routinely falsely modified entries for calls in the EVV system, or fabricated entries for calls when none had been made, without taking any steps to determine whether the aide had actually been present for their shifts.

180.     HFC's practice of circumventing its EVV system allowed aides to clock in and out of their shifts at the wrong times or from locations other than the client's home, or, in many instances, allowed aides to avoid calling to clock in or out of their shifts at all.

181.    HFC circumvented its EVV system for the purpose of billing for services that it knew or should have known had not been rendered.

182.    HFC executives not only condoned this behavior, but actively discouraged Coordinators from attempting to determine whether services had been rendered when aides failed to properly clock in or out of their shifts.

183.    In fact, according to the testimony of Coordinator 1, who was the Supervisor of the HFC Coordinators, Michael Gurevich specifically instructed Coordinators that certain aides were not required to clock in or clock out of their shifts, effectively exempting these aides from the electronic verification requirement.

184.    According to Coordinator 1's testimony, when these aides failed to properly clock in or out of their shifts, Gurevich explicitly prohibited Coordinators from contacting the client or the aide at the time of the purported service to determine whether services had been rendered.

185.    Instead, Gurevich instructed Coordinators to fabricate an entry for a fictitious call in the attendance software, or to modify an entry for an existing call, to make it appear as if the aide had rendered the scheduled service and properly clocked in and out of their shift.

186.    In other instances, HFC deliberately entered the aide's mobile telephone number as the client's home or alternate telephone number in the EVV system.

187.    In this manner, HFC deliberately circumvented the EVV system by inputting entries of false information that caused the system to function as if calls that came from the aide's mobile telephone had been made from the client's phone.  This conduct in turn prevented the EVV system from flagging the purported service as an exception, and caused the EVV system to automatically indicate verification that the scheduled services had been rendered,

thereby allowing HFC to bill for the scheduled services without requiring the aide's Coordinator to modify the aide's call or explain the aide's failure to clock in or out from the client's phone.

188.     Furthermore, despite Alexander Kiselev's claim that aides who repeatedly failed to utilize the EVV system would be disciplined and even terminated, HFC did not discipline aides even when they repeatedly failed to clock in or out of their shifts for a period of months or even years.

189.     The attendance records demonstrate that HFC Coordinators fabricated entries for numerous nonexistent calls or falsely modified dozens of entries of calls in the attendance system at one time, often days or even weeks after the scheduled service.  They also demonstrate that HFC Coordinators falsely indicated that they had "verified" that the aide had arrived and left on time for her shift without attempting to contact the client or the aide or taking any other reasonable steps to determine whether the aide had been present for their shift.

### 1) HFC Falsely Billed For Services of Aide 4

190.     As but one of numerous examples, Aide 4  failed to clock in or out of 12 separate scheduled shifts with client CXL from February 22, 2014 through March 7, 2014.  On May 29, 2014, approximately three months later, Coordinator 2 created calls in the attendance system for all 12 of these shifts in the span of seven minutes between 12:51PM and 12:58PM.

191.     Coordinator 2 did not make a note or other record in the attendance verification software that she had ever contacted client CXL or taken any other steps in the intervening months to confirm that Aide 4 had provided the scheduled services.  Coordinator 2 nevertheless asserted in the electronic attendance records that she had verified that the aide had arrived and left on time for her shift.

192.    HFC submitted false claims to Senior Health Partners' MLTCP and received a total of $1,560.00 for all 12 of Aide 4's scheduled shifts with client CXL from February 22, 2014 through March 7, 2014.  HFC also knowingly caused Senior Health Partners' MLTCP to submit false claims to Medicaid for these services. Attached as Exhibit 4 is a table listing each of these claims.

**2)    HFC Falsely Billed for Services of Multiple Aides Purportedly Verified by Coordinator 1**

193.    As another example, on May 20 & 21, 2012, Coordinator 1 fabricated entries for nonexistent calls for 52 shifts in the EVV system associated with multiple aides and clients during a one hour period in the middle of the night between 11:44PM and 12:53AM.    HFC submitted false claims to Guildnet's MLTCP and received $3,490.84 for these services.  HFC also knowingly caused Guildnet's MLTCP to submit false claims to Medicaid for these services. Attached as Exhibit 5 is a table listing each of these claims.

194.    Coordinator 1 failed to make any notation or record in the attendance verification software that he had ever attempted to contact the clients or aides or taken any other steps to confirm that the scheduled services had been provided.  Coordinator 1 nevertheless asserted in the electronic attendance records that he had verified for each of these services that the aide had arrived and left on time.

195.    When confronted with this information during his sworn testimony, Coordinator 1 admitted that he did not contact the client or the aide to confirm the aide's presence at the time he created these calls in the EVV system in the middle of the night.  While Coordinator 1 asserted that he "sometimes" called the client and the aide at the time of service when the aide failed to clock in or out, he admitted that he failed to maintain any record of his purported calls.

e) **HFC Timesheets Purporting to Document Services of Aides Who Evaded the Electronic Attendance Verification Procedure Are No More Credible Than Earlier Timesheets**

196.    As noted, *supra*, HFC policy purportedly required aides to submit a signed timesheet documenting the hours they had worked in instances when they failed to properly clock in and out of their shifts.  HFC utilized the same form timesheet it utilized prior to the implementation of an EVV system for this purpose.

197.    However, the timesheets purportedly submitted by aides who failed to properly clock in or out of their shifts show the same obvious inconsistencies in signatures and incorrect dates and listed services that the timesheets from the period before the EVV system was implemented showed.

198.    Despite HFC's knowledge that these timesheets were backup documentation for aides who had already evaded HFC's supposedly mandatory EVV requirement, HFC continued to ignore the inconsistencies and false information in these timesheets in order to bill for the scheduled services.

199.    In an interview with the State, Coordinator 2 acknowledged that she made no effort to verify that the information on the timesheets that she received was accurate. Coordinator 2 further explained that she was trained by HFC to accept the timesheet as legitimate as long as the aide and client names and dates of service were listed, regardless of whether the signatures on the timesheet appeared to be genuine or whether other information on the timesheet called into question the authenticity of the document.

200.    Accordingly, just as with the timesheets pre-dating HFC's adoption of an EVV system, timesheets post-dating the EVV system do not constitute credible or accurate documentation of services rendered.

201.    The sham nature of HFC's timesheet requirement is further evidenced by the fact that Coordinators in multiple instances created or modified a call in the attendance system without ever having received a timesheet from the aide for the time in question, let alone having reviewed it.  These Coordinators would indicate in the attendance verification software that they had "requested" a timesheet as the explanation for creating or modifying the call.

202.    During his testimony, Coordinator 1 admitted that he created entries for calls that did not occur or modified entries of calls in the EVV system without ever having received a timesheet for the time in question.

203.    In fact, timesheets submitted by aides who evaded the EVV system appear to have been created long after HFC billed for the scheduled services in order to justify billing for these services after the fact.

i)        **HFC Falsely Billed For Services of Aide 5**

204.    As but one example, Aide 5 failed to call to clock in to her scheduled shift with client GE on September 9, 2012.  A coordinator then created a call in the EVV system, and claimed that Aide 5 had experienced "phone trouble" in order to justify creating the call.

205.    Because Aide 5 had failed to clock in to her shift, HFC's policy required Aide 5 to submit a signed timesheet documenting that she had provided the scheduled services.

206.    HFC produced two different timesheets purporting to document services by Aide 5 to GE on September 9, 2012 in response to a subpoena from the State.  Both of these timesheets purport to document services on Sunday, September 9th, without indicating the year of service.  However, September 9th last fell on a Sunday in 2012.  The first of the timesheets produced by HFC records that Aide 5 rendered services to GE from 1PM to 7PM on September

9, 2012, directly contrary to the information in the EVV system, which indicates that Aide 5's shift was from 2:30PM to 8:30PM on that day.

207.   Aide 5's first timesheet for services to GE also contradicts another timesheet purporting to document her services to another client.  That timesheet records that Aide 5 provided service to VG from 7AM to 2PM on September 9, 2012, making it impossible for Aide 5 to have rendered services to GE beginning at 1PM that day.

208.   The second timesheet for Aide 5's care to GE on September 9th that HFC produced purports to document services by Aide 5 to GE from 2:30PM to 8:30 PM, but records entirely different services from the first timesheet.  Specifically, this second timesheet records that on September 9, 2012, Aide 5 only prepared meals, washed dishes, and vacuumed and swept during the entire six hour period when Aide 5 was supposed to be caring for GE.  The first timesheet, by contrast, records that Aide 5 changed and made GE's bed, cleaned his kitchen, washed his dishes, and dusted his apartment during this same six hour period.

209.   In addition, the first timesheet lists GE's address[6] as ██████████████ whereas both the second timesheet and the EVV records list GE's address as ████ ██ ██ ████

210.   Finally, the first timesheet indicates under "Position" that Aide 5 was a "PCA" or Personal Care Aide, while the second timesheet indicates that Aide 5's position was "HHA", or Home Health Aide, a difference in training and remuneration.

211.    The existence of two separate timesheets purporting to document the same date of service demonstrates that HFC either deliberately ignored obviously false information in its

---

[6] In order to avoid disclosing confidential healthcare information, addresses and phone numbers of HFC clients and aides have been redacted from the Complaint.

timesheets when billing for its aides' services, or deliberately created phony timesheets to justify billing for these services after the fact.

212.    HFC submitted false claims to Guildnet's MLTCP and received $188.76 for services purportedly rendered by Aide 5 to GE and VG on September 9, 2012.    HFC also knowingly caused Guildnet's MLTCP to submit false claims to Medicaid for these services. Attached as Exhibit 6 is a table listing each of these claims.

213.    As another example, Aide 5 failed to call to clock in to her 7:00 AM to 2:00PM shift on November 8, 2012 with client VG, and her Coordinator again indicated that she had experienced "phone trouble" in order to justify creating a call in the system.

214.    The timesheet produced by HFC purportedly documenting services by Aide 5 to VG on November 8, 2012 falsely indicates that Aide 5 rendered services on Saturday, November 8, 2012 through Friday November 14, 2012.

215.     In fact November 8, 2012, fell on a Thursday, not a Saturday, and thus none of the dates of service on these timesheets match the day of the week that the service was purportedly rendered.

216.    HFC similarly produced timesheets falsely indicating that Aide 5 rendered services to VG from Saturday, November 1 through Friday, November 7, 2012, and rendered services to GE from Sunday November 2 through Friday, November 7, 2012, and Sunday November 9 through Friday November 14, 2012.

217.    In fact, November 1st and 2nd, 2012, fell on a Thursday and Friday, respectively, and again none of the dates of service on these timesheets match the day of the week that the services were purportedly rendered.

218.    HFC submitted false claims to Guildnet's MLTCP and received $1,319.20 for services purportedly provided by Aide 5 to VG and GE from November 8 through 14, 2012. HFC also knowingly caused Guildnet's MLTCP to submit false claims to Medicaid for these services.  Attached as Exhibit 7 is a table listing each of these claims.

219.    In total, Aide 5 failed to properly clock in and out of her shifts 55 times between January 6, 2012 and April 22, 2014. HFC submitted false claims to Guildnet's MLTCP and received $4,979.01 for these services, which it had reason to believe Aide 5 had not provided. HFC also knowingly caused Guildnet's MLTCP to submit false claims to Medicaid for these services. Attached as Exhibit 8 is a table listing each of these claims.

### ii)    Further Examples of HFC's False Billings for Services of Aide 3

220.    As another of many examples, Aide 3, whose failure to submit credible timesheets prior to HFC's installation of an EVV is discussed *supra*, failed repeatedly to clock in or out of her shifts with AL, GL, VM and other clients on hundreds of occasions between January 17, 2012 and May 25, 2014.

221.    The timesheets purporting to document Aide 3's services for shifts where she failed to clock in or out show the same fatal defects as Aide 3's earlier timesheets.  Just like the earlier timesheets, every one of these timesheets indicates that Aide 3 took AL to a doctor appointment on every day that she provided services, including Saturday and Sunday, and took GL to a doctor appointment on every day except on Fridays.

222.    All of these timesheets also indicate, like the earlier timesheets, that Aide 3 regularly shampooed the hair of AL, GL and VM every week, but never assisted these clients with bathing or showering.

223.    In total, Aide 3 failed to properly clock in or out of her shifts 739 times between January 17, 2012 and May 25, 2014. HFC submitted false claims to Guildnet's MLTCP and received $42,216.45 for these services, which it had reason to believe Aide 3 had not provided. HFC also knowingly caused Guildnet's MLTCP to submit false claims to Medicaid for these services.  Attached as Exhibit 9 is a table listing each of these claims.

   f)   **HFC Circumvented Its Electronic Attendance Verification System So That HFC Could Bill for Services Which It Knew or Should Have Known Had Not Been Provided**

      i)   **HFC Continued to Bill for Services Provided by Aides Who Were Traveling Outside of the Country at the Time of the Scheduled Service**

224.    HFC's circumvention of its EVV system allowed it to continue its practice of billing for services which could not possibly have been rendered by the aide who purportedly provided the service.

      1)   **Further Examples of HFC's False Billings for Services of Aide 1 While She Was Traveling Overseas**

225.    For example, HFC continued to bill for services purportedly provided by Aide 1 during periods when Aide 1 was traveling out of the country even after the EVV system was implemented.

226.    According to records from United States Customs and Border Protection, during the period from July 7, 2012 through September 10, 2012, Aide 1 was traveling outside of the country, and therefore Aide 1 could not have provided services to any clients.

227.    HFC nevertheless submitted false claims to Guildnet's MLTCP and received a total of $9,921.16 for services purportedly provided by Aide 1 to clients LS and RS during the period July 8 through September 9, 2012, which HFC knew or should have known had not been

provided.  HFC also knowingly caused Guildnet's MLTCP to submit false claims to Medicaid for these services.  Attached as Exhibit 10 is a table listing each of these claims.

228.    On each of these days of service, Aide 1 failed to properly clock in and out of her shifts with clients LS and RS, and one of two Coordinators, Coordinator 1 or Coordinator 3, manually created or modified one or more calls in the EVV system to make it appear as if Aide 1 had been present for her shift.  Despite the fact that Aide 1 was out of the country at the time of the scheduled services, in all but two of the instances in which Coordinator 1 or Coordinator 3 manually created or modified a call for Aide 1, they falsely claimed that they had "Verified" that Aide 1 had arrived for her shift on time and left on schedule.  In the remaining instances, the words "OTH" or "mutual" are written, with no further explanation.

229.    According to HFC policy, because of her failure to comply with EVV requirements, Aide 1 was required to submit timesheets documenting her services for this period.

230.    In fact, the timesheets purporting to document Aide 1's services during this period show obviously inconsistent signatures and clearly incorrect information, just like the timesheets for the period prior to HFC's implementation of an EVV system.

231.    For example, the signatures on the timesheet purporting to document Aide 1's services to LS the week of July 14, 2012, and the timesheet purporting to document Aide 1's services to LS on July 21, 2012, show obvious variations.

232.    In addition to the discrepancies in signatures, the July 14, 2012 timesheet incorrectly spells LS 's name as ███████████ while his name is spelled correctly on the July 21, 2012 timesheet.  Finally, despite Aide 1 being scheduled to service LS for six hours every day during the week of July 14, 2012, according to the July 14 timesheet Aide 1 did nothing during these six hours except to assist LS with showering and toileting, remind him to

take his medications, make breakfast and lunch for him, and clean his kitchen.  By contrast, according to the timesheet for the week of July 21, 2012, in addition to the tasks she supposedly performed the prior week Aide 1 also managed on multiple days that week to tidy LS's room, clean his bathroom, change and make his bed, wash his dishes, shampoo his hair, dust, vacuum, sweep, mop, go to the market and do laundry, despite being scheduled for the same daily six hour shifts.

233.    Given that Aide 1 did not return to the United States until September 9, 2012, nearly two months after the dates on these timesheets, these timesheets either were fabricated by an HFC employee or executive while Aide 1 was away, or were fabricated by Aide 1 long after HFC had already billed for these services.

234.    Accordingly, HFC either deliberately fabricated documentation in order to bill for services which it knew had not been provided, or recklessly billed for these services without a reasonable basis to believe that the services had been rendered.

**2)    HFC Falsely Billed for Services of Aide 6 While He Was Traveling In the Caribbean**

235.    As another example, according to records from United States Customs and Border Protection, during the period from February 26, 2012 through March 4, 2012, Aide 6 was vacationing on the Caribbean island of St. Maarten, and could not have provided services to HFC clients.

236.    HFC nevertheless submitted false claims to Guildnet's MLTCP and received $803.88 for services purportedly provided by Aide 6 to clients OS, PS and BP during this period, which HFC knew or should have known had not been provided.  HFC also knowingly caused Guildnet's MLTCP to submit false claims to Medicaid for these services.   Attached as Exhibit 11 is a table listing each of these claims.

237.    On multiple dates of service during the period from February 26 through March 4, 2012, Aide 6 did not properly clock in and out of his shifts with OS and PS, and Coordinator 1 manually created or modified a call in the attendance system to make it appear as if Aide 6 had been present during these shifts.

238.     Despite the fact that Aide 6 was not even in the country at the time of service, Coordinator 1 falsely indicated that he had "verified" that Aide 6 had arrived and left for his shifts on time when he created or modified these calls.

239.    In addition, the timesheets purportedly documenting the services provided by Aide 6 for the period while he was traveling outside of the country show obvious inconsistencies in the signatures of at least one of the clients Aide 6 purportedly provided service to.

240.    The signatures of client OS on the timesheet purporting to document services from February 27 to March 2, 2012, when Aide 6 was traveling in the Caribbean, and on the timesheet purporting to document services from March 5 to 9, 2012, after Aide 6 had returned to the United States, show obvious variations.

241.    HFC recklessly ignored the obvious variations in the signatures on these timesheets as well as Aide 6's failure to properly clock in and out of his shifts in order to bill for services which HFC knew or should have known Aide 6 had not provided.

### 3)    HFC Falsely Billed for Services of Aide 7 While Both the Aide and Her Assigned Client Were Traveling in China

242.    As another example, HFC submitted false claims to Senior Health Partners' MLTCP and received $300.00 for 5 separate days of service from January 1 through 10, 2014 purportedly provided by Aide 7 to client KN while both Aide 7 and KN were traveling in China.

HFC also knowingly caused Senior Health Partners' MLTCP to submit false claims to Medicaid for these services. Attached as Exhibit 12 is a table listing each of these claims.

243.    According to HFC's own EVV records, Aide 7 and KN were both traveling in China during the period from January 1, 2014 through January 10, 2014. Specifically, on January 17, 2014 a note was inserted into Aide 7's employee record in the EVV system indicating that Aide 7's husband had notified HFC that both Aide 7 and KN had left the United States for China on December 31, 2013.

244.    HFC nevertheless billed for services by Aide 7 to KN on January 1, 3, 6, 8, and 10, 2014, that HFC knew or should have known had not been provided.

245.    According to HFC's EVV records, on each of these days Aide 7 failed to call to clock in or out of her shift, the attendance system flagged the scheduled service as an exception, and either Coordinator 2 or Coordinator 4 created both a clock in and a clock out call in the attendance system to make it appear as if Aide 7 had been present for her shift.

246.    Even though both client and aide were traveling abroad on these days, Coordinators 2 and 4 falsely claimed that they had verified that Aide 7 had arrived and left on time for her shifts in order to justify creating these calls in the EVV system.

247.    HFC had actual knowledge at least by January 17, 2014 that Aide 7 had not provided services to KN from January 1 through 10, 2014, but billed for the services anyway, and never reversed the billings or returned the money it received as payment for these services.

### 4)    HFC Falsely Billed for Services of Aide 8 While Her Assigned Client Was Traveling in China

248.    As another example, HFC submitted false claims to Senior Health Partners' MLTCP and received a total of $217.50 for three separate days of service purportedly provided by Aide 8 to client LML on April 3, 4 and 5, 2013, even though client LML was traveling in

China on those dates.   HFC also knowingly caused Senior Health Partners' MLTCP to submit false claims to Medicaid for these services.  Attached as Exhibit 13 is a table listing each of these claims.

249.    On April 12 2013, a note was placed into LML's client record in the EVV system indicating that "Pt went to China on the [sic] 4/2/13. . . ."  A later note in LML's client record, dated May 30, 2013, indicates that LML was not expected to return from China until at least June 1, 2013.

250.    HFC nevertheless billed for services on April 3, 4 and 5, 2013 by Aide 8 to LML, that HFC knew or should have known had not been provided.

251.    According to HFC's EVV records, on each of these days, Aide 8 failed to clock in or out of her shift, the attendance system flagged the scheduled service as an exception, and Coordinator 2 created both a clock in call and a clock out call in the EVV system to make it appear as if Aide 8 had been present for her shift.

252.    Even though client LML was not even in the country on these days, Coordinator 2 falsely claimed that she had verified that Aide 8 had arrived and left on time for her shifts with LML in order to justify creating these calls in the EVV system.

253.    HFC had actual knowledge at least by April 12, 2013 that Aide 8 had not provided services to LML on April 3, 4 and 5, 2013, but billed for the services anyway, and never reversed the billings or returned the money it received as payment for these services.

254.    In an interview with the State, Coordinator 2 stated that she recalled a number of instances when she was working at HFC where she was informed, either by a patient's family member or by some other source, that an aide or a patient had traveled overseas during a period when the aide was supposed to be servicing the patient only after HFC had already billed for the

services.  Coordinator 2 further stated that, upon receiving this information, she would contact either Coordinator 1 or Michael Gurevich, and inform them that HFC had billed for services that had not been rendered.

255.    Coordinator 2 further stated that either Coordinator 1 or Michael Gurevich would tell her that they would reverse the billings for these services, but that she had no way of knowing whether they in fact did so.  Coordinator 2 explained that, with the exception of Coordinator 1, neither she nor any other HFC coordinators had the ability to reverse the billings for HFC services.

**ii)   HFC Billed For Services Even Where HFC's Own Schedule Showed The Aide to Be In Two Places at the Same Time**

256.    HFC repeatedly scheduled its aides for back to back appointments at two different locations, without allowing the aide any time to travel between appointments, and then submitted false claims for the services.

257.    Aides scheduled for these back to back shifts would either fail to clock in or out on time for these appointments, or fail to clock in or out at all.

258.    Despite the fact that it was physically impossible for the aide to be present with both clients for the entirety of the scheduled shifts, the aide's Coordinator would later create a call in the attendance system, or modify the time of an existing call, to make it appear as if the aide had clocked in and out of both of these appointments on time.

**1)   HFC Falsely Billed for Services of Aide 9**

259.    As just one example, on January 30, 2013, February 6, 2013, February 13, 2013, February 20, 2013, March 6, 2013, and March 20, 2013, HFC billed for services purportedly provided by Aide 9 to client MFL from 9:00 AM to 1PM and for services purportedly provided by Aide 9 to client KMK from 1PM to 6PM.

260.    Client MFL and client KMK lived at least 2 miles away from each other at the time of the scheduled services.

261.    Accordingly, HFC knew or should have known that it was impossible for Aide 9 to provide the scheduled services to both MFL and KMK.

262.    On each of the above dates, Aide 9 failed to call to clock in or out of either her 9AM to 1PM shift with MFL or her 1PM to 6PM shift with KMK, and the EVV system flagged an exception for each of these scheduled services.

263.    On each of the above dates, Coordinator 2 in turn created four separate calls in the attendance system to make it appear as if Aide 9 had clocked in and out of both shifts, so that HFC could bill for both of these services.

264.    Had Coordinator 2 conducted even a cursory investigation to determine why Aide 9 had failed to clock in or out of these shifts, Coordinator 2 would have discovered that Aide 9 had been scheduled to be in two separate places at the same time.

265.    Coordinator 2, however, took no steps to investigate Aide 9's failure to clock in or out of these shifts.

266.    Coordinator 2 nevertheless falsely indicated in the EVV system that she had verified that Aide 9 had arrived and left on time for both her 9AM to1PM and 1PM to 6PM shifts.

267.    HFC submitted false claims to Senior Health Partners' MLTCP and received $348.00 for services by Aide 9 to client MFL on January 30, 2013, February 6, 2013, February 13, 2013, February 20, 2013, March 6, 2013, and March 20, 2013 that HFC knew or should have known had not been provided.  HFC also knowingly caused Senior Health Partners' MLTCP to

submit false claims to Medicaid for these services. Attached as Exhibit 14 is a table listing each of these claims.

268. HFC submitted false claims to Guildnet's MLTCP and received a total of $465.60 for services by Aide 9 to client KMK on January 30, 2013, February 6, 2013, February 13, 2013, February 20, 2013, March 6, 2013, and March 20, 2013 that HFC knew or should have known had not been provided. HFC also knowingly caused Guildnet's MLTCP to submit false claims to Medicaid for these services. Attached as Exhibit 15 is a table listing each of these claims.

### 2) HFC Falsely Billed for Services of Aide 10

269. As another example, on April 10, 2013, HFC scheduled Aide 10 to service client MFL from 9AM to 1PM, and to service client ZRG from 1:30PM to 6:30PM.

270. At the time Aide 10 purportedly serviced these clients, client MFL lived ███ ███████████████ and client ZRG lived ███████████████████████████

271. The minimum amount of time required to drive between client MFL's address ███ ███████████████ and client ZRG's address ██████████████████, is 35 minutes, assuming there is no traffic. The time required to travel between these addresses by public transport is at least 49 minutes.[7]

272. Aide 10 failed to clock in or out of either her 9AM to 1PM shift or her 1:30PM to 6:30 PM shift on April 10, 2013, and the EVV system flagged an exception for the scheduled services.

273. Aide 10's Coordinator, Coordinator 2, in turn created four separate calls in HFC's attendance system to make it appear as if Aide 10 had arrived and left on time for both her 9AM to 1PM and 1:30PM to 6:30PM shifts.

---

[7] According to the Google Maps navigation website, available at maps.google.com, last consulted on November 22, 2016.

274.     Had Coordinator 2 conducted even a cursory investigation to determine why Aide 10 had failed to clock in or out of these shifts, Coordinator 2 would have discovered that Aide 10 could not have traveled between her scheduled services with MFL and ZRG within the time allotted on the schedule.

275.     Coordinator 2, however, took no steps to investigate Aide 10's failure to clock in or out of these shifts.

276.     Coordinator 2 nevertheless falsely asserted in the attendance verification records that she had verified that Aide 10 had arrived and left on time for both her 9AM to 1PM and 1:30PM to 6:30 PM shifts.

277.     HFC submitted false claims to MLTCP Senior Health Partners and received a total of $58.00 for services purportedly provided by Aide 10 to MFL on April 10, 2013 which HFC knew or should have known had not been provided.  HFC also knowingly caused Senior Health Partners' MLTCP to submit false claims to Medicaid for these services.  Attached as Exhibit 16 is a table listing each of these claims.

278.     HFC also submitted false claims to MLTCP Elderplan, Inc. and received a total of $75.00 for services purportedly provided by Aide 10 to client ZRG on April 10, 2013 which HFC knew or should have known Aide 10 had not provided.  HFC also knowingly caused Elderplan's MLTCP to submit false claims to Medicaid for these services.  Attached as Exhibit 16 is a table listing each of these claims.

### iii)     HFC Billed For Services Even When It Knew That the Aide had Clocked In and Out from the Wrong Client's Home

279.     HFC on multiple occasions knew that its aides had clocked in or out of their shifts from phones belonging to a different client than the client the aide was supposed to be caring for, but billed for the services anyway.

56

**1)      HFC Falsely Billed for Services of Aide 11**

280.     For example, Aide 11 was scheduled to service client MFL from 9AM to 1PM on April 5, 2013.  At 9:01AM on April 5th, Aide 11 attempted to clock in to this scheduled shift by calling in to the EVV system from telephone number ███████, which belongs to client ZRG according to HFC's EVV records.

281.     Clients MFL and ZRG did not live together and did not share a phone at the time of this purported service.

282.     Because the phone number recorded by the attendance system did not match the phone number of the client, the attendance system flagged the call as an exception, requiring the aide's Coordinator to modify the call and explain this discrepancy before the scheduled service could be billed.

283.      Despite direct evidence that Aide 11 had called in from another client's phone at the start of her shift with client MFL, and could not have been servicing MFL at the time of the call, Coordinator 2 modified the call in the EVV system to make it appear as if Aide 11 had properly clocked in to her scheduled shift with MFL.

284.     Coordinator 2 provided no explanation for Aide 11's attempt to clock in to her shift from the home of a client other than the one she was supposed to be caring for, and instead falsely asserted in the EVV system that she had verified that Aide 11 had arrived and left on time for her shift with MFL.

285.     HFC, in turn, submitted a false claim to MLTCP Senior Health Partners and received $58.00 for services by Aide 11 to MFL on April 5, 2013, which HFC knew or should have known Aide 11 had not provided.  HFC also knowingly caused Senior Health Partners' MLTCP to submit false claims to Medicaid for these services.

## 2)   HFC Falsely Billed for Services of Aide 12

286.   As another example, Aide 12 was scheduled to service client MFL on March 2, 2013 from 9AM to 1PM.  Aide 12 attempted to clock into this scheduled shift by calling in to the EVV system at 8:47 AM on March 2nd from telephone number ███████████ Later the same day, Aide 12 attempted to clock out of this shift by calling from the same number at 2:58PM, two hours after her shift with MFL was supposed to have ended.

287.   Telephone number ███████████ belongs to client KCC, according to HFC's EVV records. Clients MFL and KCC did not live together and did not share a phone at the time of these purported services.

288.   Because the phone number recorded by the attendance system did not match the phone number of the client, the attendance system flagged the call as an exception, requiring Aide 12's Coordinator to modify the call and explain the discrepancy before the scheduled service could be billed.

289.   Despite direct evidence that Aide 12 had called to clock in and out of her shift with MFL from another client's phone, and could not have been servicing MFL during the scheduled shift, Coordinator 2 modified both calls in the EVV system to make it appear as if Aide 12 had properly clocked in and out of her shifts.

290.    Coordinator 2 provided no explanation for Aide 12's attempt to clock in and out from the home of a different client than the one she was supposed to be caring for, or for the fact that Aide 12 tried to clock out of her shift two hours after the shift was scheduled to end.

291.   Instead, Coordinator 2 falsely asserted in the EVV system that she had verified that Aide 12 had arrived and left on time for her March 2, 2013 shift with MFL.

292.    HFC in turn submitted a false claim to MLTCP Senior Health Partners and received $58.00 for services by Aide 12 to MFL on March 2, 2013, which it knew or should have known Aide 12 had not provided.  HFC also knowingly caused Senior Health Partners' MLTCP to submit false claims to Medicaid for these services.  Attached as Exhibit 18 is a table listing this claim.

293.    The next day, March 3, 2013, Aide 12 again attempted to clock in and out of her scheduled shift with MFL by calling from the same phone number belonging to client KCC.

294.    In addition, although Aide 12 was scheduled to service MFL from 9AM to 1PM on March 3, 2013, Aide 12 called to clock in at 8:42 AM and called to clock out at 2:59PM.

295.    Once again, despite direct evidence that Aide 12 had clocked in and out of her shift with MFL from another client's phone, and therefore could not have provided the scheduled services to MFL, Coordinator 2 modified both calls in the EVV system to make it appear as if Aide 12 had properly clocked into and out of her shifts.

296.    Coordinator 2 provided no explanation for Aide 12's attempt to clock in and out of her shift from wrong location, or for the fact that Aide 12 clocked out two hours after her shift had ended.

297.    Instead, Coordinator 2 falsely asserted in the EVV system that she had verified that Aide 12 had arrived and left on time for her March 3, 2013 shift.

298.    HFC submitted a false claim to MLTCP Senior Health Partners and received $58.00 for services by Aide 12 to MFL on March 3, 2013, which HFC knew or should have known Aide 12 had not provided.  HFC also knowingly caused MLTCP Senior Health Partners to submit false claims to Medicaid for these services.  Attached as Exhibit 19 is a table listing this claim.

### 3)   HFC Falsely Billed for Services of Aide 13

299.   As another example, on November 11, 2013, and November 18, 2013, Aide 13 was scheduled to service client ZCZ from 8 AM to 1PM, and client YGD from 2PM to 4PM, with one hour of travel time between the two shifts.  Clients ZCZ and YGD did not live at the same address or share a telephone at the time of these purported services.

300.   On both November 11 and 18, 2013, Aide 13 attempted to clock out of her shift with ZCZ at approximately 2PM, the same time Aide 13 was supposed to begin her shift with client YGD.  Both of these calls were made from ZCZ's phone, according to HFC's attendance records.

301.   Aide 13 did not call to clock in to her 2PM to 4PM shifts with YGD on either November 11 or 18, 2013.  Accordingly, the EVV system flagged Aide 13's scheduled services with both ZCZ and YGD as exceptions.

302.   Notwithstanding the fact that Aide 13 had called in to the attendance system from another client's phone at the start of her shift with YGD on both November 11th and 18th, Coordinator 2 created a clock in call for Aide 13's shift with YGD on both of these dates.  In addition, Coordinator 2 modified the time of Aide 13's call to clock out of her shift with ZCZ from 2PM to 1PM on both dates, in order to make it appear as if Aide 13 had left ZCZ's home in time to travel to YGD's home for the start of her shift.

303.   Coordinator 2 provided no explanation in the attendance records for Aide 13 calling in from another client's home at the start of her shift with YGD.

304.   Instead, Coordinator 2 falsely claimed that she had "verified" that Aide 13  had arrived and left on time for her shifts with both YGD and ZCZ.

305.    HFC in turn submitted false claims to Centerlight's MLTCP and received $60.00 for services by Aide 13 to YGD on November 11 and 18, 2013 that HFC knew or should have known Aide 13 had not provided.  HFC also knowingly caused Centerlight's MLTCP to submit false claims to Medicaid for these services.  Attached as Exhibit 20 is a table listing each of these claims.

306.    In addition, HFC submitted false claims to Senior Health Partners' MLTCP and received $150.00 for services by Aide 13 to ZCZ on these same dates that HFC knew or should have known Aide 13 had not provided.  HFC also knowingly caused Senior Health Partners' MLTCP to submit false claims to Medicaid for these services.   Attached as Exhibit 21 is a table listing each of these claims.

**iv)    HFC Deliberately Entered False Information Into Its Attendance Verification Software So That Its Aides Could Clock In and Out of Shifts From Any Place Without Detection**

307.    As discussed, *supra*, in order to ensure that the aide was actually present with the client at the time the aide clocked in or out of her shift, HFC's EVV system required aides to call from the client's phone to clock in or out of their shifts.  Accordingly, if the aide called from a telephone number that did not match any of the client's home or alternate numbers found in the attendance system's database, the attendance system would flag this call as an exception and not allow the scheduled time to be billed unless a Coordinator manually modified this call in the attendance system.

308.    HFC deliberately inputted false information into its attendance verification software in order to subvert the requirement that its aides call from the client's home to clock in and out of their shifts.

61

309.    Specifically, HFC on multiple occasions inputted the phone number of the aide assigned to service the client as that client's home or alternate telephone number in the EVV system's database.  In so doing, HFC fooled the attendance system into treating the aide's phone as if that phone belonged to the client the aide was assigned to service.

310.    HFC's entry of false information in the EVV system allowed HFC aides to clock in and out from their own mobile phones without reason or explanation.

311.    For at least 22 separate clients, the home or alternate telephone number of the client listed in HFC's attendance verification records matches a phone number belonging to an HFC aide.

312.    In total, HFC's EVV records show at least 2293 scheduled shifts in which the call to clock in or out of the aide's shift came from a phone number listed in the attendance records as belonging to both the aide and the client, and the EVV system failed to flag the call as an exception as a result.

313.    HFC knew at the time that it billed for these services that its aides had clocked in or out of their shifts from their own phones, giving them *carte blanche* to clock in and out of their shifts from a location of their choosing.

314.    HFC nevertheless never attempted to contact these aides or the clients they were assigned to service, and never took any other action to determine whether these aides were present with their clients during their scheduled shifts.

315.    HFC therefore had no reasonable basis to believe that these aides had even shown up for their scheduled shifts, but billed for these aides' services anyway.

### 1)    HFC Falsely Billed For Services of Aide 14

316.    As an example, phone number ███████████ is listed in HFC EVV records both as the phone number of Aide 14 and as the alternate phone number of client AS.  Based upon information obtained in the course of Plaintiffs' investigation of this matter, phone number ████ ██████ is a mobile telephone number associated with T Mobile.

317.    HFC submitted at least 192 false claims to Senior Health Partners' MLTCP for services purportedly provided by Aide 14 to client AS in which the call to clock in or out of the shift was made from phone number ██████████, and the EVV system failed to flag the call as an exception. HFC received at least $31,061.38 for these services. HFC also knowingly caused Senior Health Partners' MLTCP to submit false claims to Medicaid for these services.  Attached as Exhibit 22 is a table listing each of these claims.

318.    Because HFC entered phone number ████████████ in its records as client AS' alternate phone number, the attendance verification software was fooled into believing that these calls had come from client AS' phone, when in fact that the calls had come from Aide 14's mobile phone.  As a result, the attendance verification software permitted HFC to bill for the scheduled services without requiring HFC to modify the call or explain why Aide 14 had clocked in or out of the shift from her own mobile phone.

319.    HFC records list both a home telephone phone number and a first alternate phone number for client AS, in addition to listing Aide 14's mobile phone number as client AS' second alternate phone number.  Yet no reason or explanation is given in HFC's EVV records for why Aide 14 could not use client AS' home phone or first alternate phone instead of her own mobile phone to clock in and out of her shifts.

### 2)    HFC Falsely Billed For Services of Aide 15

320.    As another example, phone number ████████ is listed in HFC's EVV database both as the phone number of Aide 15 and as the alternate phone number of client KHT. Based upon information obtained in the course of Plaintiffs' investigation of this matter, phone number ████████ is a mobile telephone number associated with T-Mobile.

321.    HFC submitted at least 174 false claims to Elderplan's MLTCP for services purportedly provided by Aide 15 to client KHT in which the call to clock in or out of the shift was made from telephone number ████████, and the EVV system failed to flag the call as an exception. HFC received at least $12,123.00 for these services. HFC also knowingly caused Elderplan's MLTCP to submit false claims to Medicaid for these services. Attached as Exhibit 23 is a table listing each of these claims.

322.    Because HFC entered phone number ████████ as client KHT's alternate phone number, the attendance verification software was fooled into believing that these calls had come from KHTs phone, when the call in fact came from Aide 15's mobile phone. As a result, the attendance verification software permitted HFC to bill for the scheduled services without requiring HFC to modify the call or explain why Aide 15 had clocked in or out of her shifts from her own mobile phone.

323.    In fact, HFC EVV records list a home phone number for KHT, in addition to listing Aide 15's mobile telephone number as KHT's alternate phone number. Yet HFC failed to provide any reason in the EVV records for why Aide 15 could not use client KHT's home phone instead of her own mobile phone to clock in and out of her shifts.

### 3)    HFC Falsely Billed For Services of Aide 16

324.    As another example, telephone number ████████ is listed in HFC's EVV records as both the phone number of Aide 16 and the alternate phone number of client CYM.

Based upon information obtained in the course of Plaintiffs' investigation of this matter, phone number ███████ is a mobile phone number associated with T Mobile.

325.    HFC submitted at least 47 false claims to MLTCP Senior Health Partners for services purportedly provided by Aide 16 to client CYM in which the call to clock in or out of the shift came from phone number ███████, and the EVV system failed to flag the call as an exception.  HFC received at least $4,089.00 for these services.  HFC also knowingly caused Senior Health Partners' MLTCP to submit false claims to Medicaid for these services.   Attached as Exhibit 24 is a table listing each of these claims.

326.    Because HFC entered phone number ███████ as client CYM's alternate phone number, the attendance verification software was fooled into believing that these calls had come from CYM's phone, when in fact the calls had come from Aide 16's mobile phone.  As a result, the attendance verification software permitted HFC to bill for the scheduled services without requiring a HFC to modify the call or explain why Aide 16 clocked in or out of her shifts from her own mobile phone.

327.    HFC EVV records list a home telephone phone number for client CYM, in addition to listing Aide 16's mobile phone as client CYM's alternate phone number.  Yet no reason or explanation is given in the EVV records for why Aide 16 could not have used client CYM's home phone instead of her own mobile phone to clock in and out of her shifts.

**v)      HFC Repeatedly Modified Time Entries of Aides Who Arrived Late or Left Early for Their Shifts In Order to Bill For the Entire Duration of the Shift**

328.    There are numerous instances in which HFC aides clocked in or out at a time other than at the scheduled beginning and end of their shifts.  In some of these instances, the aide clocked in or out in the middle of his or her shift, while in other instances the aide clocked in or out hours before or after the scheduled start or end of the shift.

### 1) HFC Falsely Billed for Services of Aide 17

329.    For example, Aide 17 repeatedly clocked into or out of her scheduled shifts with client LBY in the middle of the shift.  In one instance, on April 16, 2014, Aide 17 clocked out of her scheduled 4PM- 8PM shift with client LBY at 5:43PM, over two hours before the end of the shift.

330.    Coordinator 2 subsequently modified the time of this clock out call to 8PM in order to make it appear as though Aide 17 had in fact been present for the entirety of her four hour shift, without explaining why Aide 17 had clocked out of her shift over two hours early. Instead, in each instance in which she modified a call, Coordinator 2 falsely claimed that she had verified that Aide 17 had left her shift on time.

331.    HFC submitted a false claim to Aetna's MLTCP and received $80.00 for four hours of service by Aide 17 to LBY on April 16, 2014, the entirety of Aide 17's 4-8PM shift, despite having direct knowledge that Aide 17 had clocked out of her shift over two hours early. HFC knew or should have known when it billed for these services that Aide 17 had failed to provide some or all of these services to LBY.  HFC also knowingly caused Aetna's MLTCP to submit false claims to Medicaid for these services.  Attached as Exhibit 25 is a table listing this claim.

332.     Aide 17 continued this pattern of clocking out early on multiple occasions over the next months.  On each of these occasions, Coordinator 2 would modify the time of Aide 17's clock out call to 8:00PM or later, to make it appear as if Aide 17 had been present for her entire shift, without providing any explanation for why Aide 17 had clocked out of her shift early.

332.    Instead, in each instance in which she modified a call, Coordinator 2 falsely claimed the she had verified that Aide 17 had left on schedule.

333.    The table attached as Exhibit 26 lists additional false claims, totaling $1,760.00, by HFC for Aide 17's services in instances where Aide 17 clocked in or out in the middle of her shift, a Coordinator manually modified the time of the call, and HFC billed for the entirety of Aide 17's scheduled shift.

### 2)    Further Examples of HFC's False Billings for Services of Aide 15

334.    As another example, on March 5, 2014, Aide 15 called to clock in to her 12:45PM to 5:45PM shift with client ZCZ at 4:01pm.  Furthermore, instead of calling from the client's home to clock in, Aide 15 called from a telephone number which belongs to Aide 18, according to HFC EVV records.  Recognizing a conflict both in the time of the call and the phone number called from, the attendance system flagged this call as an exception.

335.    Notwithstanding that Aide 15 had attempted to clock in to her shift over three hours late from another aide's phone, Coordinator 2 subsequently modified the time of this call to 12:45PM make it appear as if Aide 15 had clocked in to her shift on time.  Coordinator 2 provided no explanation in the EVV system for why Aide 15 had tried to clock in over three hours late.  Nor did Coordinator 2 explain why another aide's phone had been used to clock Aide 15 in to her shift, let alone why this call had not come from the client's phone.

336.    Instead, Coordinator 2 falsely claimed in the EVV system that she had verified that Aide 15 had arrived for her shift on time.

337.    HFC submitted a false claim to Senior Health Partners' MLTCP and received $75.00 for five hours of service to ZCZ, the entirety of Aide 15's 12:45PM to 5:45PM scheduled shift, despite possessing direct evidence that Aide 15 (or perhaps an entirely different aide)  had been present for only a fraction of the duration of this shift, if any aide had been present at all. HFC knew or should have known at the time that it billed for these services that Aide 15 had not

provided some or all of these services. HFC also knowingly caused Senior Health Partners'
MLTCP to submit false claims to Medicaid for these services. Attached as Exhibit 27 is a table
listing this claim.

### vi)    HFC Billed for Services Purportedly Provided by Aides Who Repeatedly Failed to Clock In or Out of Their Shifts Without Explanation or Excuse

338.    In addition to billing for services in cases where aides failed to clock in or out of
their shifts from the client's phone or failed to clock in or out on time, HFC repeatedly billed for
the services of aides who failed to make a call either to clock in or clock out of their shifts with
no legitimate reason or explanation.

339.    According to HFC's EVV records, HFC billed at least $2,265,046.14 for services
in which an HFC aide failed to make any call to the EVV system during the duration of her shift
either to clock in or clock out, and the aide's Coordinator created a clock in and clock out call in
the EVV system without providing any explanation for doing so, other than a bare assertion that
the Coordinator had verified that the aide had arrived and left on time for their shift.

340.    HFC submitted claims for these services without taking any steps to determine
whether the aide had provided services to the client or determine the reason for the aide's failure
to clock in and out.

341.    Accordingly, HFC had no reasonable basis to believe that these services had been
rendered at the time that it submitted claims for these services.

### 1)    HFC Falsely Billed for Services of Aide 19

342.    To cite one example, Aide 19 failed to make a call either to clock in or clock out
of at least 507 separate shifts between January 8, 2013 and May 21, 2014. In each of these
instances, an HFC Coordinator manually created both a clock in call and a clock out call in the

EVV system to make it appear as if Aide 19 had properly clocked in and out of her shifts when she in fact had not done so.

343.    Aide 19 was assigned by HFC to multiple clients during the period from January 8, 2013 to May 21, 2014, and was assigned new clients and additional shifts notwithstanding her failure to utilize HFC's EVV system.

344.    In fact, by February 8, 2013, Aide 19 had already failed to clock in or clock out of multiple shifts with three different clients.  Nevertheless, instead of terminating or disciplining Aide 19, HFC scheduled Aide 19 to provide three hours per day of home health services each to clients MZC and XJC, who were husband and wife and lived together at the same address. Aide 19 then failed repeatedly to clock in or clock out of hundreds of separate shifts with MZC and XJC during the next fourteen months, yet HFC never reassigned Aide 19 or terminated her employment.

345.    HFC failed to provide any explanation in the EVV records for Aide 19's failure to clock in or out in any of the instances in which Aide 19 failed to do so.

346.    Instead, an HFC Coordinator falsely claimed that they had "verified" that Aide 19 had arrived and left at the scheduled time for her shift, but did not take any steps to determine whether Aide 19 had provided the scheduled services.

347.    HFC submitted false claims to various CHHAs and MLTCPs and received a total of $32,194.90 for services purportedly provided by Aide 19 in which she failed to make a call either to clock in or clock out of her shift.  HFC had no reasonable basis to believe that Aide 19 had rendered these services at the time that HFC submitted these claims.  Attached as Exhibit 28 is a table listing each of these claims.

### 2)    HFC Falsely Billed for Services of Aide 20

348.    As another example, Aide 20 failed to call either to clock in or clock out of at least 350 separate shifts between December 8, 2012 and November 30, 2013.  In each of these instances, an HFC Coordinator manually created both a clock in and a clock out call in the EVV system to make it appear as if Aide 20 had clocked in and out of her shift when she in fact had never done so.

349.    HFC failed to provide any explanation in the EVV records for Aide 20's failure to clock in or out in any of the instances in which Aide 20 failed to do so.

350.    Instead, in each instance an HFC Coordinator falsely claimed that she had verified that Aide 20 had arrived and left at the scheduled time for her shift to justify creating the calls, but did not take any steps to determine whether Aide 20 had actually provided the scheduled services.

351.    Notwithstanding Aide 20's repeated failure over the course of a year to utilize HFC's purportedly mandatory call-in verification system, HFC failed to terminate this aide or even reassign this aide to a different client.

352.    HFC submitted false claims to multiple CHHAs and MLTCPs and received at least $28,538.50 for services purportedly provided by Aide 20 in which she failed to make a call either to clock in or clock out of her shift. HFC also caused these CHHAs and MLTCPs to submit false claims to Medicaid for these services.  HFC had no reasonable basis to believe that Aide 20 had provided the scheduled services at the time that HFC submitted these claims. Attached as Exhibit 29 is a table listing each of these claims.

### 3)    HFC Falsely Billed for Services of Aide 21

353.    As another example, Aide 21 failed to call either to clock in or clock out of 327 separate shifts with multiple clients from February 27, 2013 through May 26, 2014.  In all of

these instances, an HFC Coordinator manually created both a clock in and a clock out call in the EVV system to make it appear as if Aide 21 had properly clocked in and out of her shifts.

354.    In all but a handful of these instances, HFC failed to provide any explanation in the EVV records for Aide 21's failure to clock in or out of her shifts. In a handful of instances, the word "double call" is written, with no further explanation.

355.    Instead of providing an explanation, Aide 21's Coordinator falsely claimed that they had verified that Aide 21 had arrived and left on time for her shift to justify creating the calls, but did not take any steps to determine whether Aide 21 had provided the scheduled services.

356.    HFC submitted false claims to Guildnet's MLTCP and received a total of $24,939.36 for services purportedly provided by Aide 21 in which she failed to make a call either to clock in or out of her shift.  HFC also caused Guildnet's MLTCP to submit false claims to Medicaid for these services.  HFC had no reasonable basis to believe that Aide 21 had provided the scheduled services at the time that HFC submitted these claims. Attached as Exhibit 30 is a table listing each of these claims.

**vii)    HFC Provided Phony Explanations for Its Aides' Failure to Clock In or Out of Their Shifts**

357.    As discussed, *supra,* in the vast majority of instances in which an aide failed to properly clock in or clock out of his or her shift, the aide's Coordinator would attempt to justify modifying or creating a call in the EVV system by falsely claiming to have "verified" that the aide had arrived and left on time, when in fact the Coordinator had taken no steps which could have allowed them to determine whether the aide had provided the scheduled services.

358.    However, in some instances, Coordinators would input a purported explanation for the aide's failure to properly clock in or out in order to justify modifying or creating the call, such as, for example, that the aide had experienced phone trouble.

359.    HFC Coordinators, however, deliberately avoided taking any steps to determine whether the explanations they inputted into the EVV system were truthful and accurate.

360.    As a result, the explanations HFC provided in its attendance records for its aides' failure to clock in or out of their shifts are not credible, and no reasonable person would have relied upon such explanations as evidence that the scheduled services had been provided.

### 1)  HFC Falsely Billed for Services of Aide 22

361.    As an example, according to HFC's attendance records, Aide 22 on multiple occasions failed to call to clock into her shift, purportedly because she experienced phone trouble, yet was able to make a call later the same day from the same client's phone to clock out of her shift.  On other occasions, Aide 22 was able to clock into her shift but purportedly could not call to clock out of her shift later the same day because of phone trouble.

362.    For example, on February 17, 2014, Aide 22 failed to call to clock in to her scheduled 3:00PM to 9:00PM shift with client GR, and Coordinator 1 later manually created a call in the attendance system and indicated that Aide 22 had experienced phone trouble when trying to clock in.

363.    GR has a home phone number and an alternate phone number listed in HFC's attendance records, and thus Aide 22 would had to have been unable to use either of GR's phones for the claim of phone trouble to be genuine.

364.    In fact, later in the day on February 17, 2014, a call was made from one of  GR's phones to clock Aide 22 out of the same shift.

365.    Coordinator 1 provided no explanation in the EVV for why Aide 22 had successfully called to clock out from one of GR's phones a few hours after she supposedly was unable to clock in due to phone trouble.

366.    Similarly, on February 24, 2014 no call was made to clock Aide 22 out of her scheduled 8:30AM to 2:30PM shift with client LR, and Coordinator 1 later manually created a call in the attendance system and indicated that Aide 22 had experienced phone trouble when trying to clock out.

367.    LR has a home phone number and two alternate phone numbers listed in HFC's attendance records, and Coordinator 1 provided no explanation for why all three of LR's phones were not in working order when Aide 22 tried to clock out of her shift.

368.    In fact, earlier in the day on February 24, 2014, a call was made from one of LR's three phones to clock Aide 22 in to her shift.

369.    Coordinator 1 provided no explanation for why Aide 22 was able to clock in to her shift with LR on the morning of February 24, 2014, but supposedly was unable to use any of LR's three phones to clock out of the same shift.

370.    In total, according to HFC's attendance records, Aide 22 experienced phone trouble at least 13 times with at least 4 separate clients, none of whom shared the same phone.

371.    During his testimony, Coordinator 1 claimed that Aide 22 told him she had experienced phone trouble on these occasions, but admitted that he never attempted to speak with any of Aide 22's clients to verify that her claims of phone trouble were legitimate, and never even asked Aide 22 why she had experienced phone trouble with so many different clients.

372.    HFC submitted false claims to Guildnet's MLTCP and received a total of $1,256.70 for services in which Aide 22 failed to clock in or out of her shifts purportedly

because of "phone trouble."  HFC also caused Guildnet's MLTCP to submit false claims to Medicaid for these services.  HFC had no reasonable basis to believe that Aide 22 had rendered these services at the time that HFC submitted these claims. Attached as Exhibit 31 is a table listing each of these claims.

**B.    HFC AND ALEXANDER KISELEV RECKLESSLY BILLED FOR SERVICES THAT WERE PROVIDED BY UNTRAINED AND UNQUALIFIED AIDES USING STOLEN IDENTITIES**

373.    Alexander Kiselev is and has been at all times relevant to this Complaint the President and a co-owner, with his wife, of HFC.

374.    HFC's primary source of revenue comes from its billing for home health aide and personal care aide services allegedly provided to Medicaid recipients.

375.    HFC billed for services which it knew had not been provided by the aide HFC listed on its invoices and in its EVV records, and instead had been provided by untrained and unqualified aides, if they were provided at all.

376.    By falsely listing the name of a trained and qualified aide as the service provider on its invoices when billing for services, HFC was able to disguise its employment of untrained and unqualified HHAs and PCAs who should never have serviced HFC clients.

377.    Alexander Kiselev knew or should have known that HFC was billing for services provided by aides who used false identities, and took no meaningful steps to investigate the occurrence of this practice even after he was confronted by the individuals whose identities had been stolen.

**a)  HFC Falsely Billed for Services of Aide 23**

378.    For example, HFC submitted false claims to CHHA Extended Home Care and received a total of $85,050.00 for services purportedly provided by Aide 23 to client AR, which

Aide 23 never in fact provided.  HFC also knowingly caused CHHA Extended Home Care to submit false claims to Medicaid for these services.  Attached as Exhibit 32 is a table listing each of these claims.

379.    Aide 23 had previously applied for employment with HFC, and was qualified to work as a home health aide or personal care aide, but she never actually worked at HFC or serviced HFC clients.

380.    In the course of applying for employment at HFC, Aide 23 provided her birthdate, social security card, permanent resident alien identification card, and other personally identifying information to HFC.

381.    During an interview with the State, Aide 23 was presented with timesheets produced by HFC purporting to document Aide 23's services to AR.  Aide 23 denied ever signing any of these timesheets, and stated that the aide signatures found on these timesheets are not hers.

382.    In fact, Aide 23's purported signatures on these timesheets are markedly different than the signatures on her application for employment at HFC.

383.    In addition, on the timesheet purporting to document services from May 21 to 23, 2011, every box under daily and weekly services is marked, indicating that Aide 23 supposedly performed every one of the thirty different services listed on the timesheet on all three days. Notably, a number of these services, such as laundry, ironing, vacuuming, mopping, sweeping, and filing the client's fingernails, are listed under weekly services on HFC's form timesheet, yet the May 21 to 23, 2011 timesheet is marked to indicate that Aide 23 provided every one of these services on three consecutive days.

384.    Although HFC issued checks payable to Aide 23 for her purported services, Aide 23 did not cash or deposit any of these checks.

385.    At least one of the checks issued by HFC payable to Aide 23 was endorsed by an individual by the name of Individual 1, and deposited into a JPMorgan Chase bank account under Individual 1's name.

386.    Account documents obtained from JPMorgan Chase for Individual 1's account list Individual 1's personal address as ████████████████████████ This same address is listed in HFC's records as the home address of AR, the client listed in HFC's records as having been serviced by Aide 23.

387.    As a result of HFC's use of Aide 23's identity when billing for services to AR, in or about 2012 Aide 23 received notice from the Internal Revenue Service that she owed taxes on earnings purportedly paid to her by HFC that she in fact never earned and never received.

388.    After receiving this notice, Aide 23 visited HFC's offices, and spoke to two persons, one of whom was identified to her as a supervisor.  Aide 23 informed them that she had received a tax bill for money she purportedly earned at HFC even though she had never worked for HFC.

389.    Neither of the persons whom Aide 23 spoke to were willing to address her concerns at that time, and no one at HFC ever followed up with Aide 23.

390.    To date, HFC has failed to return any of the money it received for services which it billed for under Aide 23's stolen identity.

391.    Alexander Kiselev knew or should have known that HFC was billing for services of unqualified individuals working under false identities, but took no meaningful steps to stop the practice.

392.    In his sworn testimony, Mr. Kiselev admitted that he had been approached by a number of individuals who informed him that they had received tax bills from the Internal Revenue Service for income they had purportedly earned from HFC even though they had never worked for HFC.

393.    These individuals informed Mr. Kiselev that they believed that their identities had been stolen by individuals who were working as aides at HFC, and asked for help resolving their issues with the Internal Revenue Service.

394.    Despite the fact that he was informed by multiple persons that their identities were being used by unknown individuals to provide services to HFC clients, Alexander Kiselev took no steps to determine who, if anyone, had provided the services which HFC had billed under these persons' names.

395.    Mr. Kiselev spuriously claimed in his testimony that did not believe the persons who approached him because he did not believe that it was possible for someone to steal all of the pieces of identifying information required to obtain work under another individual's identity.

396.    However, Mr. Kiselev knew or should have known that HFC, like any employer, collected all of the required information from anyone who applied for employment, and that anyone with access to HFC's personnel records would have all of the necessary information to obtain work under another individual's identity.

397.    Alexander Kiselev also testified that the persons who had approached him claiming that their identities had been stolen had immigrated to the United States from Samarkand, a city in Uzbekistan, and further testified that he believed that these persons had deliberately provided their identifying information to their friends and family members so that they could obtain work.

398.    Alexander Kiselev testified that, based upon this reasoning, he had decided to stop hiring individuals from Samarkand, Uzbekistan in order to prevent more individuals from working for HFC under stolen identities.

399.    Alexander Kiselev took no other steps either to ensure that previously billed services had been provided by the aides who were listed in HFC's billing records, or to ensure that HFC did not continue to send individuals working under stolen identities to service clients.

400.    Alexander Kiselev knew or should have known that refusing to hire individuals based upon their city of origin was not a reasonable, effective, or appropriate method of ensuring that HFC services were being provided by qualified aides.

## C.    ALEXANDER KISELEV DELIBERATELY IGNORED MOUNTAINS OF EVIDENCE THAT HFC WAS BILLING FOR SERVICES THAT WERE NEVER PROVIDED

401.    As President and co-owner of HFC, Mr. Kiselev testified that HFC's use of the EVV system was mandatory from the time that it was implemented in 2012.

402.    Mr. Kiselev, however, took no steps himself to ensure that HFC aides were properly utilizing the EVV system before HFC submitted claims for the services of these aides.

403.    As discussed, *supra,* even a cursory review of HFC's EVV records would have revealed that HFC aides failed to properly clock in or out of their shifts on hundreds of thousands of occasions.

404.    In addition to being the co-owner and President of HFC, Alexander Kiselev, along with a partner, is the owner of Care Centa, Inc., a company whose sole product is EVV software.

405.    Mr. Kiselev testified that he, along with his business partner, built the Care Centa company from scratch, and that he is responsible for managing sales of Care Centa's EVV software to home health agencies.

406.   As noted, *supra*, in or about May 2014, at Mr. Kiselev's direction, HFC ceased using its existing electronic attendance verification software, which had been provided by a company known as Arrow Solutions, and began using the Care Centa electronic attendance verification software.

407.   In addition to switching HFC to Care Centa's software, Alexander Kiselev marketed and continues to market Care Centa's software to other agencies.

408.   At a minimum, Alexander Kiselev would have become familiar with the operation of HFC's EVV system in the course of developing the Care Centa software and overseeing HFC's transition to Care Centa's software.

409.   It would strain credulity to accept that Mr. Kiselev failed to notice the large number of HFC aides who failed to properly clock in or out of their shifts in the course of developing his own EVV software and installing this software at HFC.

410.   Alexander Kiselev knew or should have known at least by the time that he developed and installed Care Centa's EVV software that HFC aides were evading HFC's purportedly mandatory EVV system on a widespread basis. Any reasonable person in Mr. Kiselev's position with this knowledge would have taken steps to determine whether these aides had actually provided the services for which HFC had billed.

411.   Mr. Kiselev took no steps at any point either to determine whether these services had been rendered or to return any monies that HFC received as payment for these services.

412.   Mr. Kiselev similarly took no steps to ensure that aides did not continue to evade HFC's  EVV system after HFC began using the Care Centa software.

413.    In fact, the Care Centa software used by HFC contains no meaningful controls or safeguards which could prevent HFC from continuing to subvert its EVV system in all of the ways discussed in this Complaint.

414.    Mr. Kiselev's failure to take action demonstrates that, at a minimum, Mr. Kiselev recklessly or intentionally ignored HFC's submission of false claims for services that were not rendered.

415.    Alexander Kiselev further testified that HFC at all times required its aides to submit a timesheet when they failed to properly clock in or out of their shifts using the EVV system, and that HFC required aides to submit a timesheet for all services before HFC implemented the EVV system.

416.    However, Alexander Kiselev took no steps to ensure that the timesheets submitted by aides who failed to properly clock in or out were accurate.

417.    In or about January 2014, the State issued a subpoena pursuant to N.Y. Exec Law § 63(12) to HFC (the "January 2014 Subpoena") as part of its investigation into the allegations that form the basis for this Complaint in Intervention.

418.    In response to the January 2014 Subpoena, HFC produced, *inter alia*, copies of timesheets purporting to document services provided by certain HFC aides who were named in the Subpoena, and certain of these timesheets have been referenced in this Complaint.

419.    Any reasonable person in Alexander Kiselev's position as the president and co-owner of HFC would have, at a minimum, supervised the production of documents to the State in response to the Subpoena to ensure that all responsive documents were produced.

420.    If Alexander Kiselev had reviewed even a sample of the timesheets produced by HFC to the State, he would have noticed the obvious inconsistencies in the signatures and inaccurate information on these timesheets.

421.    No reasonable person in Alexander Kiselev's position would have relied upon these timesheets as truthful and accurate documentation of services rendered by HFC aides.

422.    Alexander Kiselev failed to take any action in response to the January 2014 subpoena to determine whether the services purportedly documented in the timesheets that HFC produced had been rendered.

423.    As noted, *supra*, 18 NYCRR § 515.2  provides  that "[i]t is an unacceptable practice to [f]ail to maintain or to make available for purposes of audit or investigation records necessary to fully disclose the medical necessity for and the nature and extent of the medical care, services or supplies furnished, or to comply with other requirements of this Title."

424.    Alexander Kiselev knew or should have known at least by the time HFC produced timesheets in response to the January 2014 Subpoena that HFC's timesheets did not constitute reliable and accurate documentation of the services for which HFC billed.

425.    Accordingly, at least by the time that HFC produced the timesheets in response to the January 2014 Subpoena, Alexander Kiselev became obligated to take steps to ensure that HFC returned all monies it received for these services.

426.    However, to date Alexander Kiselev has failed to reverse the billings or return the monies HFC received for the services purportedly documented on the timesheets HFC produced to the State in response to the January 2014 Subpoena.

## FIRST CLAIM FOR RELIEF
(by the State Against All Defendants)
(New York State False Claims Act: Presentation of False Claims)
(N.Y. State Fin. Law § 189(1)(a))

427.     The State repeats and realleges each of the proceeding paragraphs as if fully set forth herein.

428.     During the period of time described in the Complaint, HFC, Alexander Kiselev, and Michael Gurevich knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, presented or caused to be presented to the State false or fraudulent claims for payment for home health aide and personal care aide services purportedly provided by HFC aides which were not in fact provided, or were provided in violation of the laws, rules and regulations of the Medicaid program.  In addition, HFC, Alexander Kiselev, and Michael Gurevich, knowingly, or acting in deliberate ignorance or reckless disregard for the truth, presented or caused to be presented to the State false or fraudulent claims for payment for home health aide and personal care aide services while failing to maintain documentation demonstrating that the services were provided, in violation of the laws, rules and regulations of the Medicaid Program.  Accordingly, HFC, Alexander Kiselev and Michael Gurevich knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of N.Y. State Fin. Law § 189(1)(a).

429.     By reason of the false or fraudulent claims, the State has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty of $6,000 to $12,000 for each violation.

## SECOND CLAIM FOR RELIEF
(by the United States Against All Defendants)
(Presentation of False Claims, 31 U.S.C. § 3729(a)(1)(A))

430.    The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

431.    HFC, Alexander Kiselev, and Michael Gurevich presented, or caused to be presented, to the United States for payment or approval false or fraudulent claims for home health aide and personal care aide services purportedly provided by HFC aides which were not in fact provided, or were provided in violation of the laws, rules and regulations of the Medicaid program.

432.    Such acts were made or done knowingly, as defined in 31 U.S.C.§ 3729(a)(1).

THIRD CLAIM FOR RELIEF
(By the State Against All Defendants)
(New York State False Claims Act: Making or Using False Records or
Statements to Cause Claims to be Paid)
(N.Y. State Fin. Law § 189(1)(b))

433.    The State repeats and realleges each of the proceeding paragraphs as if fully set forth herein.

434.    During the period of time described in the Complaint, HFC, Alexander Kiselev and Michael Gurevich knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, submitted materially false and fraudulent invoices, claims for payment and other records to Certified Home Health Agencies and Managed Care Organizations with which HFC contracted to provide services falsely indicating that HFC had provided home health aide and personal care aide services that were not provided, or were provided in violation of the laws, rules and regulations of the Medicaid program.    In so doing, HFC, Alexander Kiselev and Michael Gurevich knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, caused these Certified Home Health Agencies and Managed Care Organizations to submit

false or fraudulent claims for payment or approval to the State, in violation of N.Y. State Fin.
Law § 189(1)(b).

435.    By reason of the false records or statements, the State has sustained damages in a
substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty
of $6,000 to $12,000 for each violation.

FOURTH CLAIM FOR RELIEF
(By the United States Against All Defendants)
(Making or Using False Records or Statements, 31 U.S.C. § 3729(a)(1)(B))

436.    The United States incorporates by reference all paragraphs of this Complaint as if
fully set forth.

437.    HFC, Alexander Kiselev and Michael Gurevich made, used or caused to be made
or used, false records or false statements material to false or fraudulent claims submitted to the
United States for home health aide and personal care aide services that were not provided, or
were provided in violation of the laws, rules and regulations of the Medicaid program.

438.    Such acts were made or done knowingly, as defined in 31 U.S.C. § 3729(a)(1),

FIFTH CLAIM FOR RELIEF
(By the State Against Defendants HFC and Alexander Kiselev)
(New York State False Claims Act: Presentation of False Claims)
(N.Y. State Fin. Law § 189(1)(a))

439.    The State repeats and realleges each of the proceeding paragraphs as if fully set
forth herein.

440.    During the period of time described in the Complaint, HFC and Alexander
Kiselev knowingly, or acting in deliberate ignorance or in reckless disregard for the truth,
presented or caused to be presented to the State false or fraudulent claims for payment for home
health aide and personal care aide services provided by unqualified individuals who provided

services under false identities.  Accordingly, HFC and Alexander Kiselev knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of N.Y. State Fin. Law § 189(1)(a).

441.    By reason of the false or fraudulent claims, the State has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty of $6,000 to $12,000 for each violation.

### SIXTH CLAIM FOR RELIEF
(By the United States Against Defendants HFC and Alexander Kiselev)
(Presentation of False Claims,  31 U.S.C. § 3729(a)(1)(A))

442.    The United States incorporates by reference all paragraphs of this Complaint as if fully set forth.

443.    HFC and Alexander Kiselev presented, or caused to be presented, to the United States for payment or approval false or fraudulent claims for payment for home health aide and personal care aide services provided by unqualified individuals who provided services under false identities.

444.    Such acts were made or done knowingly, as defined in 31 U.S.C.§ 3729(a)(1).

### SEVENTH CLAIM FOR RELIEF
(By the State Against Defendants HFC and Alexander Kiselev)
(New York State False Claims Act: Making or Using False Records or Statements to Cause Claims to be Paid)
(N.Y. State Fin. Law § 189(1)(b))

445.    The State repeats and realleges each of the proceeding paragraphs as if fully set forth herein.

446.    During the period of time described in the Complaint, HFC and Alexander Kiselev knowingly, or acting in deliberate ignorance or in reckless disregard for the truth,

submitted materially false and fraudulent invoices, claims for payment and other records to Certified Home Health Agencies and Managed Care Organizations with which HFC contracted to provide home health aide and personal care aide services which falsely indicated that services had been performed by qualified aides when in fact they had been provided by unqualified individuals.    In so doing, HFC and Alexander Kiselev knowingly, or acting in deliberate ignorance or in reckless disregard for the truth, caused these Certified Home Health Agencies and Managed Care Organizations to submit false or fraudulent claims for payment or approval to the State, in violation of N.Y. State Fin. Law § 189(1)(b).

447.    By reason of the false records or statements, the State has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty of $6,000 to $12,000 for each violation.

## EIGHTH CLAIM FOR RELIEF
(By the United States Against Defendants HFC and Alexander Kiselev)
(Making or Using False Records or Statements, 31 U.S.C. § 3729(a)(1)(B))

448.    The United States incorporates by reference all paragraphs of this Complaint as if fully set forth.

449.    Defendants HFC and Alexander Kiselev made, used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to the United States for home health aide and personal care services that had been provided by unqualified individuals.

450.    Such acts were made or done knowingly, as defined in 31 U.S.C. § 3729(a)(1).

## NINTH CLAIM FOR RELIEF
(By the State Against All Defendants)
(NY FCA: Reverse False Claim)
(N.Y. State Fin. § 189(1)(g))

86

451.    The State repeats and realleges each of the preceding paragraphs as if fully set forth herein.

452.    During the period of time described in this Complaint, Defendants violated New York State Finance Law § 189(1)(g) in that they knowingly made, used, or caused to be made or used, false records and statements material to obligations to pay or transmit money to the State.

453.    Included in the definition of "obligation" is the retention of an overpayment.

454.    Defendants made false statements and records that resulted in their obtaining Medicaid funds for services that were not rendered, or were rendered in violation of the laws, rules and regulations of the Medicaid Program.

455.    Defendants knew or should have known that they were in possession of Medicaid monies to which they were not entitled, but they have failed to return the wrongfully obtained funds to the State.

456.    By virtue of Defendants' conduct, the State has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty of $6,000 to $12,000 for each violation.

## TENTH CLAIM FOR RELIEF
### (By the State Against All Defendants)
### (New York Social Services Law §145-b)

457.    The State repeats and realleges each of the preceding paragraphs as if fully set forth herein.

458.    As set forth above, HFC, Alexander Kiselev and Michael Gurevich knowingly presented or caused to be presented to the State false or fraudulent claims for payment.

459.    The State paid such false or fraudulent claims because of the acts of HFC, Alexander Kiselev and Michael Gurevich.

460.    By reason of the conduct of HFC, Alexander Kiselev and Michael Gurevich, the State has been damaged in a substantial amount to be determined at trial.

461.    By reason of the foregoing, HFC, Alexander Kiselev and Michael Gurevich are liable, pursuant to N.Y. Social Services Law §145-b, to the State for treble damages, penalties, and costs.

## ELEVENTH CLAIM FOR RELIEF
### (By the State Against All Defendants)
### (New York Executive Law § 63(12): Repeated and Persistent Fraud)

462.    The State repeats and realleges each of the preceding paragraphs as if fully set forth herein.

463.    N.Y. Executive Law § 63(12) makes "repeated fraudulent . . . acts of . . . persistent fraud . . . in the carrying on, conducting or transaction of business actionable by the Attorney General."

464.    By engaging in the acts and practices described above, HFC, Alexander Kiselev and Michael Gurevich have engaged in repeated fraudulent acts or persistent fraud in violation of N.Y. Executive Law § 63(12).

465.    By reason of the foregoing, HFC, Alexander Kiselev and Michael Gurevich are liable to the State for damages, in an amount to be determined at trial.

## TWELFTH CLAIM FOR RELIEF
### (By the State Against All Defendants)
### (New York Executive Law § 63-c: Overpayment of Public Funds)

466.    The State repeats and realleges each of the preceding paragraphs as if fully set forth herein.

467.    The acts and practices of HFC, Alexander Kiselev and Michael Gurevich complained of herein constitute a misappropriation of public property, in violation of N.Y.

Executive Law § 63-c.  By reason of the foregoing, the State is entitled to restitution from HFC, Alexander Kiselev and Michael Gurevich in an amount yet to be determined, plus the maximum amount of interest available under law.

## THIRTEENTH CLAIM FOR RELIEF
### (By the State Against All Defendants)
### (Unjust Enrichment)

468.    The State repeats and realleges each of the preceding paragraphs as if fully set forth herein.

469.    This is a claim for the recovery of monies by which HFC, Alexander Kiselev and Michael Gurevich have been unjustly enriched.

470.    By directly or indirectly obtaining State Government funds to which they were not entitled, HFC, Alexander Kiselev and Michael Gurevich have been unjustly enriched, and are liable to account for and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the State.

## FOURTEENTH CLAIM FOR RELIEF
### (By the United States Against All Defendants)
### (Unjust Enrichment)

471.    The United States incorporates by reference all paragraphs of this Complaint set out above as if fully set forth.

472.    As a consequence of the acts set forth in this Complaint, HFC, Alexander Kiselev and Michael Gurevich were unjustly enriched at the expense of the United States in amounts to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

473.    The United States claims the recovery of all monies by which HFC, Alexander Kiselev and Michael Gurevich have been unjustly enriched.

WHEREFORE, the State demands and prays that judgment be entered in its favor against Defendants as follows:

1. On the First, Third,  Fifth, Seventh and Ninth Claims for Relief under the NY FCA, for the amount of the State's damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper;

2. On the Tenth Claim for Relief under New York Social Services Law § 145-b, for the amount of the State's damages, trebled, plus interest at the highest legal rate;

3. On the Eleventh Claim for Relief under New York Executive Law § 63(12), for restitution to the State based on Defendants' repeated or persistent fraudulent and illegal practices, for the economic injuries suffered by the State;

4. On the Twelfth and Thirteenth Claims for Relief, for the damages sustained and/or amounts by which Defendants were unjustly enriched or by which Defendants retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper.

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Defendants as follows:

1. On the Second Claim for Relief under the FCA, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together will all such further relief as may be just and proper;

2. On the Fourth Claim for Relief under the FCA, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together will all such further relief as may be just and proper;

3.  On the Sixth Claim for Relief under the FCA, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together will all such further relief as may be just and proper;

4.  On the Eighth Claim for Relief under the FCA, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together will all such further relief as may be just and proper;

5.  On the Fourteenth Claim for Relief for unjust enrichment, for the amounts that HFC, Alexander Kiselev and Michael Gurevich have been unjustly enriched, plus interest, costs and expenses, and for all such further relief as may be just and proper.

Respectfully submitted,

Dated: December 19, 2016          ROBERT L. CAPERS
Brooklyn, New York            United States Attorney
                            Eastern District of New York
                            Attorney for United States
                            271 Cadman Plaza East
                            Brooklyn, New York 11201

                   By:    s/ Elliot M. Schachner
                            Elliot M. Schachner
                            Assistant U.S. Attorney
                            (718) 254-6053

Dated: December 19, 2016          ERIC T. SCHNEIDERMAN
New York, New York            Attorney General of the State of New York

                 By:  s/ Andrew Gropper
                      Andrew Gropper
                      Jill Brenner
                      Special Assistant Attorneys General
                      Medicaid Fraud Control Unit
                      120 Broadway, 13th Floor
                      New York, New York 10271-0007
                      Telephone:  (212) 417-5395/5377